*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0295P (6th Cir.)
File Name: 02a0295p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

JERICOL MINING, INC. and
OLD REPUBLIC INSURANCE
COMPANY,

*Petitioners,*

No. 01-3156

*v.*

EUGENE NAPIER and
DIRECTOR, OFFICE OF
WORKERS' COMPENSATION
PROGRAMS, UNITED STATES
DEPARTMENT OF LABOR,

*Respondents.*

On Petition for Review of a Decision and Order
of the Benefits Review Board, United States
Department of Labor.
No. 99-0342 BLA.

Argued: August 7, 2002

Decided and Filed: August 30, 2002

Before: MOORE and GILMAN, Circuit Judges; ROSEN,
District Judge.*

_____

* The Honorable Gerald E. Rosen, United States District Judge for
the Eastern District of Michigan, sitting by designation.

---

**COUNSEL**

---

**ARGUED:** Mark E. Solomons, GREENBERG TRAURIG, LLP, Washington, D.C., for Petitioners. Barry H. Joyner, U.S. DEPARTMENT OF LABOR, OFFICE OF THE SOLICITOR, Washington, D.C., Sidney B. Douglass, Harlan, Kentucky, for Respondents. **ON BRIEF:** Mark E. Solomons, Laura Metcoff Klaus, GREENBERG TRAURIG, LLP, Washington, D.C., for Petitioners. Barry H. Joyner, Christian P. Barber, U.S. DEPARTMENT OF LABOR, OFFICE OF THE SOLICITOR, Washington, D.C., Sidney B. Douglass, Harlan, Kentucky, for Respondents.

---

**OPINION**

---

RONALD LEE GILMAN, Circuit Judge. Eugene Napier filed a claim for benefits under the Black Lung Benefits Act (BLBA) in March of 1993. An administrative law judge (ALJ) initially awarded Napier benefits, but the Department of Labor's Benefits Review Board (the Board) vacated the ALJ's order and remanded the case for further consideration. On remand, the ALJ once again issued an order awarding benefits to Napier. This time the Board affirmed the ALJ's determination. Jericol Mining, Inc., Napier's former employer, has appealed the Board's decision. For the reasons set forth below, we **AFFIRM** the decision of the Board.

**I. BACKGROUND**

Napier, who was born on June 6, 1949, began working as a coal miner in May of 1972 and continued to serve in that capacity for 20 years. He worked as a repairman and as a section foreman, and was exposed to coal dust on a daily basis. Before he stopped working in May of 1992, Napier was employed by Jericol as a repairman in a Kentucky mine. That position required him to perform a variety of strenuous

physical activities, including bending, stooping, and heavy lifting.

Napier filed an application for benefits under the BLBA on March 9, 1993. During the administrative consideration of Napier's claim, Jericol was identified as the coal-mine operator that would be liable for the payment of any benefits (the responsible operator). The Department of Labor's (DOL) claims examiner denied Napier's request for benefits in August of 1993. Napier filed a motion with the Board for reconsideration, resulting in the reversal of the claims examiner's decision by the DOL's District Director. Jericol then requested review by an ALJ.

The ALJ issued a Decision and Order granting Napier's claim for benefits in May of 1996. In reaching his decision, the ALJ considered medical reports from six physicians who examined Napier at various points between May of 1992 and November of 1995. Four of these physicians—Dr. Glen Baker, Dr. Arthur Frank, Dr. N. Kabani, and Dr. J. D. Miller—reached a diagnosis of pneumoconiosis, but two others—Dr. Bruce Broudy and Dr. A. Dahhan—did not. The ALJ found the medical opinions of Dr. Baker, Dr. Frank, and Dr. Miller more persuasive than those of Dr. Broudy and Dr. Dahhan because the former physicians' conclusions were consistent with Napier's employment history and the purportedly positive x-ray readings that indicated pneumoconiosis, and because Dr. Baker and Dr. Miller are board-certified in internal medicine and pulmonary medicine. (Dr. Kabani's credibility was not assessed in the ALJ's initial Order and Decision.) In addition, the ALJ attached greater significance to Dr. Baker's opinions because the physician had examined Napier annually between 1992 and 1995.

The ALJ also determined that Napier was totally disabled, a finding that was based upon (1) the results of nine ventilatory studies and eight arterial blood gas studies, and (2) the medical opinions that Napier was unable to return to work as a coal miner. Finally, the ALJ concluded that Napier had established that his ailment was caused by exposure to coal

dust. This last finding was based upon the reports of Dr. Baker and Dr. Frank. The ALJ identified February 1, 1994 as the commencement date for Napier's benefits.

Napier filed a motion for reconsideration, arguing that his benefits should begin on the date of his disability rather than in February of 1994. The ALJ agreed, and issued an amended order in September of 1996 that changed the commencement date of Napier's benefits to June 1, 1992. This order also recognized that the initial decision erroneously stated that all of the arterial blood gas studies were "qualifying" for a finding of total disability. In fact, none of these studies supported Napier's claim. But the ALJ reaffirmed his determination that the pulmonary function studies and the preponderance of medical evidence supported a finding of total disability.

On appeal, the Board vacated the ALJ's decision and remanded the case for further consideration of three issues: (1) the diagnosis of pneumoconiosis, (2) the existence and cause of disability, and (3) the proper date for benefits to commence. The Board specifically instructed the ALJ to explain his findings regarding whether the x-rays supported a diagnosis of pneumoconiosis, noting that the initial order lacked any rationale for attributing greater weight to the positive readings, which supported a diagnosis of pneumoconiosis, than to the negative ones. In addition, the Board concluded that the ALJ's decision to discount the opinions of Dr. Broudy and Dr. Dahhan was irrational, because the ALJ's view was based upon the problematic analysis of the x-ray readings and a failure to recognize that all of the examining physicians considered Napier's 20 years of coal-mine employment.

With respect to whether Napier was totally disabled, the Board determined that the ALJ had neglected to consider all of the relevant evidence and had failed to explain the weight he accorded to the inconsistent opinions from the physicians. The ALJ was also instructed to reconsider whether, in light of all of the evidence, Napier's total disability was due to

### III. CONCLUSION

This appeal, like many black-lung benefit cases, admittedly presents a close case. On balance, however, we conclude that the ALJ's findings are supported by substantial evidence that Napier satisfied the requirements necessary to receive benefits under the BLBA. We therefore **AFFIRM** the decision of the Board.

Napier's usual coal-mine employment. In addition, Jericol argues that the ALJ failed to resolve conflicting evidence regarding the physical demands of Napier's work. Neither of these arguments has merit.

Contrary to Jericol's contention, Dr. Baker and Dr. Dahhan both recognized that Napier worked underground as a repairman. This position has a precise meaning in the context of coal mining, and the ALJ could rationally conclude that Dr. Baker and Dr. Dahhan understood the demands of working as a repairman. More importantly, Dr. Baker expressed his view that Napier's ailments prevent him from performing any work that requires physical exertion or exposure to coal dust. The ALJ's findings of fact reflect that Napier had worked as a repairman, where he was exposed to coal dust on a daily basis and had to perform heavy lifting. As a result, even if Dr. Baker, Dr. Dahhan, and Dr. Miller did not convey a precise knowledge of the demands of Napier's job, the ALJ could rationally conclude that an inability to perform physically demanding work and the need to avoid exposure to coal dust prevents Napier from working as a coal miner.

With respect to Jericol's contention that the ALJ failed to resolve conflicting evidence in the record as to the physical demands of Napier's work, the ALJ specifically found that Napier was "a very credible witness." Any discrepancy in the evidence regarding the nature of Napier's work was therefore implicitly resolved in his favor. The ALJ's failure to recognize any purported differences in the record on this issue was therefore harmless, if an error at all.

Jericol's central argument, when stripped to its essentials, appears to be a quarrel with the ALJ's credibility determinations. But this court is required to defer to the ALJ's assessment of the physicians' credibility. *Peabody Coal Co. v. Groves*, 277 F.3d 829, 836 (6th Cir. 2002) ("Lacking the authority to make credibility determinations, we will defer to the ALJ's findings."). In light of the entire record, we conclude that the ALJ's findings were based upon substantial evidence and therefore should be affirmed.

pneumoconiosis. Finally, with respect to the commencement date of benefits, the Board directed the ALJ to explain the reason that he credited Dr. Baker's first report in June of 1992 as establishing total disability, thus serving as the basis for beginning benefits in that month.

The ALJ issued a Decision and Order on Remand in November of 1998. With respect to the x-rays, the ALJ found that this evidence did not establish pneumoconiosis, because the majority of the physicians who read the x-rays determined that they were negative. But the ALJ concluded that Napier had nevertheless presented substantial evidence of pneumoconiosis, relying upon four of the medical opinions. In particular, the ALJ found that Dr. Baker's opinion was entitled to greater weight than the views of Dr. Broudy and Dr. Dahhan because Dr. Baker had examined Napier on four separate occasions between June of 1992 and September of 1995, thereby giving him "extensive experience" with Napier's medical history. The ALJ also gave additional weight to Dr. Kabani's opinion because she was Napier's treating physician.

Pursuant to the Board's instructions, the ALJ next reconsidered the question of whether Napier had established that he was totally disabled. The ALJ determined that both the nine qualifying ventilatory studies and the medical opinion evidence supported a finding of a totally disabling respiratory impairment. In addition, the ALJ once again concluded that Napier established that his total disability was at least partly the result of his coal-mine employment. This conclusion is supported by the reports of Dr. Baker and Dr. Frank, whose opinions the ALJ believed were entitled to greater weight than those of Dr. Broudy and Dr. Dahhan. Finally, the ALJ reversed his position as to the commencement date for benefits by returning to February 1, 1994, the month in which Napier requested a reconsideration of the DOL claims examiner's denial of his claim for benefits.

Jericol appealed the ALJ's Decision and Order on Remand, but the Board affirmed the award of benefits in June of 2000.

The Board concluded that the ALJ's decision was supported by substantial evidence and contained no reversible error. It portrayed Jericol's objections to the ALJ's assessment of the medical opinions as a request to conduct a de novo review of the evidence, which the Board lacks the authority to do.

The Board subsequently denied Jericol's motion for reconsideration without comment in December of 2000. This timely appeal of the Board's Decision and Order followed.

## II.  ANALYSIS

### A.   Standard of review

"We have a very narrow scope of review over the Board's decisions, which must be affirmed unless the Board has committed legal error or exceeded its scope of review of the ALJ's findings." *Peabody Coal Co. v. Groves*, 277 F.3d 829, 833 (6th Cir. 2002) (*Groves*). A similar highly deferential standard applies to the ALJ's analysis: "This court's role in reviewing an ALJ's decision is limited to determining whether substantial evidence supports the ALJ's conclusions." *Gray v. SLC Coal Co.*, 176 F.3d 382, 387 (6th Cir. 1999). As this court recently explained, "we will not reverse the conclusions of an ALJ that are supported by substantial evidence, even if the facts permit an alternative conclusion." *Groves*, 277 F.3d at 833 (internal quotation marks omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (internal quotation marks omitted). In accordance with these standards, "[w]e do not reweigh the evidence or substitute our judgment for that of the ALJ." *Tennessee Consol. Coal Co. v. Kirk*, 264 F.3d 602, 606 (6th Cir. 2001).

### B.   Requirements of a claim for benefits under the BLBA

The BLBA "provide[s] benefits . . . to coal miners who are totally disabled due to pneumoconiosis . . . ." 30 U.S.C. § 901(a). "In order to establish entitlement to benefits, a claimant must prove that: (1) he suffers from

performed, Dr. Baker, Dr. Frank, and Dr. Miller all gave the dates and results of the tests that they conducted. The ALJ's belief that the opinion of Dr. Baker was entitled to additional weight simply because of the physician's annual examinations of Napier, although erroneous, does not alter the fact that the ALJ was entitled to find that other factors, based on the objective record, made Dr. Baker's views more credible than those of Dr. Broudy and Dr. Dahhan.

Jericol also argues that it was irrational for the ALJ to attach credibility to the views of Dr. Baker, Dr. Frank, and Dr. Miller after the ALJ concluded that, contrary to the opinions of these physicians, the x-rays did not support a finding of pneumoconiosis. This contention, however, overlooks the fact that these physicians' diagnoses were not based solely on the x-ray evidence. Similarly, Jericol's argument overlooks a claimant's ability to establish legal pneumoconiosis notwithstanding negative x-ray readings. 20 C.F.R. § 718.202(a)(4) (recognizing that legal pneumoconiosis does not require a positive x-ray reading). The ALJ's decision to disagree with their analyses of the x-rays, therefore, does not result in a complete refutation of these doctors' opinions.

In addition to challenging the ALJ's finding that Napier has pneumoconiosis, Jericol also argues that the ALJ's determination that Napier is totally disabled was not rational. The ALJ, however, concluded that the nine ventilatory studies were sufficient to establish total disability. Moreover, the ALJ discussed the medical opinion evidence, noting that four of the six physicians were of the opinion that Napier was totally disabled, that Dr. Broudy expressed his opinion that Napier might be totally disabled, and that Dr. Frank was silent on the issue. Based upon these considerations, the ALJ determined that the evidence supporting total disability outweighed the results of the arterial blood gas studies, which did not support a finding of total disability.

Jericol further contends that the ALJ's conclusion regarding total disability was flawed because the examining physicians' opinions did not reveal any knowledge of the requirements of

The ALJ nevertheless made a credibility determination by finding that the opinions of Dr. Baker, Dr. Frank, Dr. Kabani, and Dr. Miller were more persuasive than those of Dr. Broudy and Dr. Dahhan. In particular, the ALJ explained that even though the x-ray evidence had been discredited, the first four physicians based their diagnoses on additional factors. Dr. Baker's opinion focused upon the connection between Napier's exposure to coal dust and his various ailments. The diagnosis of Dr. Frank emphasized a pulmonary function study. Dr. Kabani performed a spirometry that contributed to her diagnosis. Finally, Dr. Miller had relied upon pulmonary function studies, Napier's medical history, and a physical examination in reaching his conclusion that Napier had pneumoconiosis.

But Jericol contends that the opinions of Dr. Baker and Dr. Kabani, and presumably the views of the other two physicians, as well, were not documented and reasoned. As discussed above, we agree that the ALJ erred in relying upon Dr. Kabani's opinion due to the lack of supporting documentation. We therefore limit our discussion to the views of the other three physicians.

The basic flaw in Jericol's argument is that it fails to recognize that "[t]he determination as to whether [a physician's] report was sufficiently documented and reasoned is essentially a credibility matter. As such, it is for the factfinder to decide." *Director, OWCP v. Rowe*, 710 F.2d 251, 255 (6th Cir. 1983). In making this determination, the ALJ must "examine the validity of the reasoning of a medical opinion in light of the studies conducted and the objective indications upon which the medical opinion or conclusion is based." *Id* (footnote omitted).

The record in the present case supports the ALJ's determination to credit the opinions of Dr. Baker, Dr. Frank, and Dr. Miller. Not only did the ALJ discuss the studies that led these physicians to diagnose Napier with pneumoconiosis, but he also considered the contrary test results. Unlike Dr. Kabani, who did not provide any details of the tests that she

pneumoconiosis; (2) the pneumoconiosis arose out of coal mine employment; and, (3) the pneumoconiosis is totally disabling." *Peabody Coal Co. v. Hill*, 123 F.3d 412, 415-16 (6th Cir. 1997). The claimant has the burden of proving each of these requirements "by a preponderance of the evidence, except insofar as he is aided by a presumption." *Id*. at 416.

Pneumoconiosis is defined as "a chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment." 30 U.S.C. § 902(b). The defining characteristic of pneumoconiosis for the purpose of the BLBA is that its symptoms arise as a consequence of being exposed to dust while working in coal mines. 20 C.F.R. § 718.201(b) (explaining that "a disease 'arising out of coal mine employment' includes any chronic pulmonary disease or respiratory or pulmonary impairment significantly related to, or substantially aggravated by, dust exposure in coal mine employment"). "This legal definition of pneumoconiosis . . . encompasses a wider range of afflictions than does the more restrictive medical definition of pneumoconiosis." *Cornett v. Benham Coal, Inc.*, 227 F.3d 569, 575 (6th Cir. 2000) (internal quotation marks omitted). A miner who has pneumoconiosis is "totally disabled" if the impairment "prevents him or her from engaging in gainful employment requiring the skills and abilities comparable to those of any employment in a mine or mines in which he or she previously engaged with some regularity and over a substantial period of time." 30 U.S.C. § 902(f)(1)(A).

## C. Presumptions based on treatment and frequency of examination

Jericol first argues that the ALJ improperly relied upon an automatic presumption that a physician's opinion is entitled to greater weight if that physician has treated the claimant. According to Jericol, such a "treating-physician presumption" is never appropriate. Jericol also insists that a presumption requiring an ALJ to defer to the opinions of a treating physician would violate the Administrative Procedure Act's

(APA) emphasis on "reasoned decisionmaking in light of the record," because it would "relieve[] claimants of their burden of persuasion by automatically assuming that treating doctors' opinions are more persuasive without regard to the opinion itself or anything in the record."

This court recently addressed the issue of whether a treating physician's opinion is entitled to additional weight in *Peabody Coal Co. v. Groves*, 277 F.3d 829 (6th Cir. 2002) (*Groves*). After recognizing that *Tussey v. Island Creek Coal Company*, 982 F.2d 1036 (6th Cir. 1993), "confirmed that the 'opinions of treating physicians are entitled to greater weight than those of non-treating physicians,'" *Groves* rejected the contention that *Tussey* requires an ALJ to give absolute deference to the opinion of a treating physician. *Groves*, 277 F.3d at 834 (quoting *Tussey*, 982 F.2d at 1042) (refusing to accept Peabody Coal Company's argument that *Tussey* established a treating-physician presumption that is contrary to the requirements of the APA). Instead, *Groves* clarified that "*Tussey* requires ALJs in black lung cases to examine the medical opinions of treating physicians on their merits and to make a reasoned judgment about their credibility. These opinions should be '[g]iven their proper deference.'" *Id.* (quoting *Tussey*, 982 F.2d at 1042).

The factors discussed in 20 C.F.R. § 718.104(d)(5) are relevant for determining the appropriate weight that should be assigned to the opinions of treating physicians. *Wolf Creek Collieries v. Director, OWCP*, -- F.3d --, --, 2002 WL 1769283, at *9 (6th Cir. 2002) (noting that this regulation is "instructive"); *Groves*, 277 F.3d at 834 (citing 20 C.F.R. § 718.104(d)(5) with approval). Although this regulation applies only to evidence developed after January 19, 2001, "it codifies judicial precedent and does not work a substantive change in the law." *Nat'l Mining Ass'n v. Dep't of Labor*, 292 F.3d 849, 861 (D.C. Cir. 2002) (holding that the treating-physician rule embodied in 20 C.F.R. § 718.104(d)(5) is not retroactive). The revised regulation, which establishes a treating-physician rule, provides that

views was appropriate in light of the entire record is an issue that we consider below.

## D. Substantial evidence

Jericol's remaining argument is that the ALJ's reliance upon the opinions of Dr. Baker and Dr. Kabani was unreasonable. This position essentially challenges whether the ALJ's decision was based upon substantial evidence. Because Jericol focuses on the ALJ's conclusion that Napier has pneumoconiosis and is totally disabled, we will do the same.

The ALJ's determination that Napier has pneumoconiosis was based upon a finding of legal pneumoconiosis under 20 C.F.R. § 718.202(a)(4). That regulation provides that

[a] determination of the existence of pneumoconiosis may also be made if a physician, exercising sound medical judgment, notwithstanding a negative X-ray, finds that the miner suffers or suffered from pneumoconiosis as defined in § 718.201. Any such finding shall be based on objective medical evidence such as blood-gas studies, electrocardiograms, pulmonary function studies, physical performance tests, physical examination, and medical and work histories. Such a finding shall be supported by a reasoned medical opinion.

20 C.F.R. § 718.202(a)(4).

In considering the requirements of this regulation, the ALJ noted that Dr. Baker, Dr. Frank, Dr. Kabani, and Dr. Miller had all expressed the opinion that Napier had pneumoconiosis. Dr. Broudy and Dr. Dahhan, in contrast, reached the opposite conclusion. The ALJ found all of these physicians to be highly qualified and their opinions to be well-reasoned. As the ALJ recognized, Dr. Baker, Dr. Broudy, Dr. Dahhan, and Dr. Frank were all board-certified in internal and pulmonary medicine.

examinations. This factor was evidently significant in the ALJ's analysis, because he concluded that "Dr. Baker's extensive experience with Mr. Napier's medical history entitles his opinion to more weight."

The problem with the ALJ's analysis is that he did not specifically consider whether the four annual examinations by Dr. Baker were materially different from the two examinations that Dr. Dahhan performed during the same time frame. Moreover, nothing in the record supports a conclusion that Dr. Baker's additional examinations gave him a more thorough understanding of Napier's condition. Dr. Baker did not alter his views over the course of his examinations. Instead, Dr. Baker repeatedly diagnosed Napier as having (1) pneumoconiosis, based upon Napier's x-rays and the duration of his exposure to coal dust, (2) chronic obstructive airway disease with moderate ventilatory defect, based upon Napier's pulmonary function testing, and (3) chronic bronchitis, based upon Napier's medical history.

An important practical consideration also supports our conclusion that the ALJ erred in attributing greater weight to the opinion of Dr. Baker solely because he had examined Napier on an annual basis. Specifically, such an approach would enable claimants to "stack the deck" by frequently visiting a physician who provided a favorable diagnosis, and then arguing that the opinion of that examining physician should automatically be accorded extra weight. We do not believe that such a "frequent examiner" presumption is consistent with the APA's requirement that the ALJ's decision be based upon substantial evidence.

For the above reasons, we conclude that the ALJ erred in attributing greater weight to the opinion of Dr. Baker simply because he saw Napier more frequently than the other examining physicians. Nevertheless, the ALJ was permitted to weigh the credibility of Dr. Baker in the same manner that he evaluated the credibility of the other medical opinions. The question of whether the ALJ's reliance upon Dr. Baker's

[i]n appropriate cases, the relationship between the miner and his treating physician may constitute substantial evidence in support of the adjudication officer's decision to give that physician's opinion controlling weight, provided that the weight given to the opinion of a miner's treating physician shall also be based on the credibility of the physician's opinion in light of its reasoning and documentation, other relevant evidence and the record as a whole.

20 C.F.R. § 718.104(d)(5).

These considerations are not only consistent with the requirement that an ALJ's decision be based upon substantial evidence, but also are in line with the views of our sister circuits that have considered the relevance of a treating physician's opinion. *See Nat'l Mining Ass'n*, 292 F.3d at 861 ("The consensus among courts has been that an agency adjudicator may give weight to the treating physician's opinion when doing so makes sense in light of the evidence and the record, but may not mechanistically credit the treating physician solely because of his relationship with the claimant.") (citing *Groves* as well as cases from the Fourth and Seventh Circuits with approval). For these reasons, Jericol is mistaken both in its belief that an automatic treating-physician presumption exists and in its position that the opinion of a treating physician is never entitled to added weight.

Jericol also contends that the ALJ in the present case erroneously concluded that the physician who treated Napier (Dr. Kabani) and the physician who examined him multiple times (Dr. Baker) were by reason of these relationships more credible than the other physicians, without the ALJ giving proper consideration to their reasoning and other relevant evidence. According to Jericol, the record does not justify giving their opinions greater weight than the views of the other examining physicians.

With regard to the ALJ's reliance upon the opinions of Dr. Kabani, the only explanation given by the ALJ for attaching

greater significance to her views was that she served as Napier's treating physician. Dr. Kabani began seeing Napier in March of 1994, when she evaluated him for respiratory complaints. She saw him twice in that month, but did not see him again until five months later.

Although Dr. Kabani said that she continued to see Napier on subsequent occasions, the record is silent as to the factors that are relevant in determining whether her opinions as Napier's treating physician are entitled to greater weight, considerations such as the nature and duration of the relationship, as well as the frequency and extent of the treatment. 20 C.F.R. § 718.104(d) (instructing the ALJ to consider these factors "in weighing the opinion of the miner's treating physician"). Nor does the record contain the dates or results of any tests that Dr. Kabani performed. The absence of any documentation to support Dr. Kabani's views precludes the ALJ from relying upon her opinions. *Director, OWCP v. Rowe*, 710 F.2d 251, 255 (6th Cir. 1983) (explaining that in making credibility determinations, the ALJ must "examine the validity of the reasoning of a medical opinion in light of the studies conducted and the objective indications upon which the medical opinion or conclusion is based") (footnote omitted).

For the above reasons, we conclude that the ALJ's decision to give extra weight to the opinion of Dr. Kabani, or even to rely upon her views, was inappropriate. *Cf. Groves*, 277 F.3d at 835 (concluding that the ALJ was justified in giving extra weight to the opinion of a physician who had treated the claimant for 25 years, a physician whose treatment notes and medical records were fully considered by the ALJ).

Turning to the ALJ's evaluation of Dr. Baker's opinions, the ALJ noted that Dr. Baker examined Napier four times—on June 17, 1992, May 6, 1993, March 9, 1994, and September 6, 1995. The only other physician, aside from Dr. Kabani, who examined Napier more than once was Dr. Dahhan. Napier was seen twice by Dr. Dahhan, once on September 24, 1992 and again on November 27, 1995.

Unlike Dr. Kabani, who actually treated Napier, both Dr. Baker and Dr. Dahhan were examining physicians. A treating physician sees a patient for the purpose of dealing with that individual's medical condition, whereas an examining physician in the BLBA context evaluates a coal miner's health in relation to that individual's claim for benefits. *See* Webster's Collegiate Dictionary, 10th ed., 403, 1258 (defining "treat" as "to care for or deal with medically or surgically" and "examine" as "to test the condition of"). We believe that the same factors that justify placing greater weight on the opinions of a treating physician are appropriate considerations in determining the weight to be given an examining physician's views.

Several of those factors—the nature and duration of the relationship, and the extent of the examinations—do not provide a basis for distinguishing Dr. Baker from Dr. Dahhan. Although Dr. Baker examined Napier on four occasions over four years, Dr. Dahhan saw Napier at both the beginning and the end of that same four-year period. The overall duration of Napier's relationship with these two physicians was therefore identical. As a result, Dr. Dahhan, like Dr. Baker, would have been able to observe any changes in Napier's conditions or any symptoms that might have been slow to emerge. The nature of Napier's relationship with these physicians was also indistinguishable, because both doctors acted as examining physicians.

Moreover, both physicians considered the same evidence in reaching their conclusions: Napier's employment history and smoking habits, his medical history, a symptomatology, x-rays, physical examinations, blood gas studies, and pulmonary function studies. The only additional test performed by either physician was an EKG conducted by Dr. Dahhan. Thus, the extent of their examinations provides no basis for attaching greater significance to the opinion of Dr. Baker than to that of Dr. Dahhan.

The only difference between the relationships that these two physicians had with Napier is the frequency of the