*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0261P (6th Cir.)
File Name: 03a0261p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

EASTOVER MINING CO.,
            *Petitioner,*

            *v.*

DOROTHY S. WILLIAMS and
DIRECTOR, OFFICE OF
WORKERS' COMPENSATION
PROGRAMS, UNITED STATES
DEPARTMENT OF LABOR,
            *Respondents.*

No. 01-4064

On Petition for Review from an Order of the Benefits
Review Board, United States Department of Labor.
No. 00-0362 BLA.

Submitted: July 16, 2003

Decided and Filed: July 31, 2003

Before: KEITH, SUHRHEINRICH, and CLAY, Circuit
Judges.

---

## COUNSEL

**ON BRIEF:** Mark E. Solomons, Laura Metcoff Klaus,
GREENBERG & TRAURIG, Washington, D.C., for
Petitioner. Fred M. Busroe, Jr., CARTER & BUSROE,
Harlan, Kentucky, for Respondents.

---

## OPINION

---

CLAY, Circuit Judge. Petitioner Eastover Mining Co.
appeals an order issued by the Benefits Review Board of the
United States Department of Labor, finding Respondent
Dorothy Sue Williams, widow of Decedent Gordon Williams,
entitled to an award of benefits pursuant to the Black Lung
Benefits Act, 30 U.S.C. §§ 901-45. For the reasons set forth
below, we **REVERSE** the Benefits Review Board.

## FACTS

Decedent was born on January 13, 1927 and died on
July 13, 1993. According to his death certificate, Decedent
died from a pulmonary embolism due to Chronic Obstructive
Pulmonary Disease ("COPD"), itself caused by an acute
gastrointestinal bleed. Decedent smoked between one pack
and one-half pack of cigarettes daily for approximately four
decades before quitting in 1986. Decedent worked as a
surface miner for thirty-seven years, retiring in 1983 when the
mine where he worked ceased operations. He applied for and
ultimately received federal black lung benefits, although state
officials denied his claim for occupational disability benefits.[1]

---

[1]With respect to his federal black lung benefits, an ALJ found the
existence of pneumoconiosis established because conflicts in the record
among qualified physicians created "true doubt" that the ALJ resolved in

Decedent's relevant medical history begins in April of 1982, when Dr. Jerry Woolum diagnosed Decedent with COPD and acute bronchitis.[2]    Woolum has board certifications in general practice and surgery. Decedent saw many other physicians in connection with his claim for living worker benefits and these doctors ordered numerous x-rays. Sixteen different readers analyzed these images, and only one of the six B-readers board-certified in radiology felt any film showed pneumoconiosis.[3]

---

Decedent's favor, because pneumoconiosis is a progressive disease, and because the ALJ concluded that a single doctor's opinion could not outweigh a greater number of medical opinions supporting Decedent. The Supreme Court and other courts, including this one, have subsequently discredited the fact-finding methods employed in the 1983 proceeding. *See, e.g., Dir., OWCP v. Greenwich Collieries*, 512 U.S. 267, 280-81 (1994) (rejecting the "true doubt" rule); *Nat'l Mining Ass'n v. Dep't of Labor*, 292 F.3d 849, 863-64 (D.C. Cir. 2002) (rejecting the view that latent pneumoconiosis is generally progressive based on the Department of Labor's concession that latent pneumoconiosis rarely progresses); *Woodward v. Dir., OWCP*, 991 F.2d 314, 321 (6th Cir. 1993) (rejecting reliance on numerical superiority as a valid method to resolve conflicts in the record).

[2] Decedent first saw Woolum in 1979.

[3] A "B-reader" has demonstrated proficiency in assessing and classifying x-rays for pneumoconiosis by successfully completing an examination conducted by or on behalf of the Department of Health and Human Services. 20 C.F.R. § 718.202(a)(1)(ii)(E). A board-certified radiologist has received a certification in radiology from either the American Board of Radiology or the American Osteopathic Association. *Id.* at § 718.202(a)(1)(ii)(C). Four of the six readings performed by fully-credentialed analysts involved films taken between 1983 and 1985. The remaining two fully-credentialed analysts reviewed films from July of 1993, less than two weeks before Decedent died. The one fully-credentialed reader who found pneumoconiosis reached his conclusion based on the analysis of an October 18, 1983 film, and he later partly recanted his diagnosis.

Other readers with less expertise analyzed the x-rays with conflicting results. Four readers with no formal expertise in radiology whatsoever saw pneumoconiosis in films taken in October and November of 1984, as

In March of 1983, Dr. A. Dahhan examined Decedent in connection with his living miner disability claim. Although Dahhan believed Decedent suffered from a pulmonary or respiratory impairment, Dahhan thought Decedent's continued smoking caused the problem because the pattern of impairment disclosed in pulmonary function studies, the absence of x-ray evidence of pneumoconiosis, and the presence of occasional crepitations on clinical examination are all indicia of disability induced by smoking, not coal dust.

On October 20, 1984, Dr. Robert Penman examined Decedent.    Although Penman had neither B-reader certification nor board certification in radiology, Penman diagnosed Decedent with pneumoconiosis based on Decedent's x-rays.    Penman concluded that Decedent's suffered pulmonary impairment partly from pneumoconiosis and partly from smoking. Penman could not separate the two risk factors.

Dr. William Anderson examined Decedent on November 28, 1984.    Anderson found no evidence of pneumoconiosis in Decedent's x-rays.    Anderson instead suspected COPD due to smoking. Anderson also diagnosed hypertensive cardiovascular disease, mixed psychoneurosis and osteoarthritis.

---

did a non-board-certified B-reader. A board-certified radiologist (but not a B-reader) found no pneumoconiosis based on film from August and November of 1983, as did a B-reader lacking board certification.

Although this muddle of different certifications and different films understandably tends to create confusion, one matter is completely clear: only one of the six fully-credentialed readers found pneumoconiosis. He did so based on a film taken in 1983 and later expressed reservations about his opinion.

Dr. Clarke[4] examined Decedent on December 17, 1984. He diagnosed pneumoconiosis by x-ray as well as severe restrictive and obstructive lung disease based on pulmonary function studies. Clarke declared that pneumoconiosis rendered Decedent totally disabled.

Dr. Ballard Wright examined Decedent on March 30, 1985. Wright read one of Decedent's x-rays as positive for pneumoconiosis and interpreted his pulmonary function studies as showing severe restrictive and obstructive impairment, but concluded that smoking caused Decedent's poor pulmonary function.

With respect to the Woolum, Decedent's "treating physician," pneumoconiosis is mentioned only briefly in the "previous history" section of his report.[5] Pneumoconiosis appears in Woolum's medical record twice more—first, in December of 1986, when Decedent reported anxiety and depression related to his pursuit of black lung benefits, and second, in January of 1987, when Woolum again listed pneumoconiosis in the "previous history" portion of a medical report. These are the only references to pneumoconiosis Woolum recorded.

Over the next eleven years between Decedent's initial visit to Woolum and his eventual death, Woolum treated Decedent

---

[4]Like many of the physicians discussed herein, Dr. Clarke's first name does not appear in the Joint Appendix.

[5]To assist Decedent in obtaining living miner disability benefits immediately prior to his retirement, Woolum wrote on June 8, 1983 that Decedent suffered from chronic peptic ulcer disease with acute exacerbation, diverticular disease of the colon with periodic exacerbations, hypertension controlled with medication, and manic depression, requiring chronic medication. At a deposition on August 22, 1985, Woolum declared that Decedent's x-rays revealed evidence of pneumoconiosis and that it contributed to his COPD. Woolum offered no basis for this conclusion during the deposition or in any of Decedent's medical records.

for a cyst, hypertension, a hernia, acute influenza, peripheral vascular disease, acute bronchitis, pneumonia, a transient ischemic attack, several episodes of respiratory distress, carotid artery disease, acute gastrointestinal bleeding, a urinary tract infection, and acute septicemia. In July of 1990, Woolum diagnosed end-stage COPD. During Decedent's final hospitalization, Woolum reported massive upper gastrointestinal bleeding, erosive gastritis, and active peptic ulcer disease. Decedent died despite surgical intervention intended to stop the bleeding.

The hospital discharge papers included these final diagnoses: (1) pulmonary embolism; (2) post-inflammatory pulmonary fibrosis; (3) emphysema; (4) acute upper GI bleed (ulcer); (5) acute anemia due to severe blood loss; (6) gastritis with hemorrhage; (7) *cor pulmonale*; and (8) peripheral vascular disease. During his treatment of Decedent, Woolum never conducted regular pulmonary function studies or blood gas tests, nor did Woolum diagnose pneumoconiosis.

## PROCEDURAL HISTORY

Respondent filed for survivor's benefits on August 2, 1993, two weeks after Decedent's death. On January 24, 1994, after administrative processing by the Department of Labor ("DOL"), a claims examiner denied Respondent's claim because she failed to establish Decedent died from pneumoconiosis. On May 25, 1994, DOL reversed itself and found the evidence sufficient. At Petitioner's request, the claim proceeded to an Administrative Law Judge ("ALJ") for trial.

On May 8, 1995, the ALJ issued a decision and order denying Respondent's claim. ALJ Charles P. Rippey considered a February 24, 1994 report by Woolum that claimed:

[Decedent's] pulmonary disease progressed during the years I cared for him and the last several years of his life

he was in respiratory failure . . . most of the time. He was hospitalized several times requiring ventilatory support to keep him alive. The terminal event was likely a pulmonary embolus. Unfortunately, an autopsy was not granted by the family. I have no problem stating that this gentleman was disabled secondary to his lung disease of which pneumoconiosis, in my mind, was certainly a contributing factor.

(J.A. at 72.) Before trial, however, ALJ Rippey met with both sides and informed Respondent's counsel that this letter alone did not constitute sufficient proof.

At trial, Respondent introduced a new letter from Woolum dated March 10, 1995. This time, Woolum concluded, "within a reasonable degree of medical probability," that pneumoconiosis "hastened [Decedent's] death."[6] (*Id.*) Although ALJ Rippey gave "extra weight to the opinion of Dr. Woolum because he was the treating physician," ALJ Rippey based his decision to deny benefits on several factors. First, the March 10, 1995 opinion conflicted with his February 24, 1994 letter. Second, the March 10, 1995 letter failed to specify "in what matter the pneumoconiosis hastened [Decedent's] death." (*Id.*) Judge Rippey asked, rhetorically, whether "it led to his development of an embolus earlier than it would otherwise have developed? Did the pneumoconiosis cause death earlier than would otherwise have occurred once the embolus developed?" (*Id.*) Third, ALJ Rippey noted that the March 10, 1995 letter stated only that Woolum could conclude with a reasonable degree of medical "probability" that the pneumoconiosis hastened the death, as opposed to the usual language, "with a reasonable degree of medical certainty." (*Id.*)

---

[6] Woolum hypothesized that, although the pulmonary embolus directly caused the miner's death, pneumoconiosis hastened his demise because the miner's "lack of oxygen [and] his retained carbon dioxide all played an effect on all parts of his body." (J.A. at 277.)

Finally, ALJ Rippey refused "to ignore the surrounding circumstances." (*Id.*) Judge Rippey "infer[red] that Dr. Woolum's March 10, 1995 opinion was given following a discussion with [Respondent's] counsel, and that Dr. Woolum wanted to say all that he could to strengthen [Respondent's] case." (J.A. at 73.)

Petitioner filed a timely appeal to the Benefits Review Board ("BRB"), which vacated ALJ Rippey's decision on April 24, 1996. The BRB rejected ALJ Rippey's characterization of Woolum's second opinion as a shift or departure from his initial conclusion; rather, the BRB termed Woolum's new opinion a "clarification" of his earlier conclusion. (J.A. at 67.) The Board also refused to find that the timing of Woolum's second letter made Woolum's statements less reliable. The BRB thus remanded the case to a new ALJ for further consideration.

The new ALJ, Clement J. Kichuk, gave little weight to Petitioner's experts. Instead, holding for Respondent, ALJ Kichuk argued that:

> [i]t is apparent from the voluminous medical reports that Dr. Woolum had [Decedent] under close and constant treatment over a period of fourteen years which provided him with an outstanding opportunity to determine the exact nature and cause of his patient's pulmonary and respiratory impairment with reliance upon repeated tests, evaluations, and observations of response to proscribed medicines and therapy.

(J.A. at 61.) This time, Petitioner appealed to the BRB. Although the BRB initially affirmed ALJ Kichuk, the BRB remanded the case to ALJ Kichuk following Petitioner's motion for reconsideration. Specifically, the BRB found that ALJ Kichuk based his decision on the "true doubt" test that

the Supreme Court found impermissible in *Director, OWCP v. Greenwich Collieries*, 512 U.S. 267, 280-81 (1994).[7]

On the second remand, Petitioner introduced evidence that radiologists who examined Decedent's x-rays found no evidence of pneumoconiosis. Importantly, Petitioner offered the analysis of Dr. A. Dahhan, a physician board-certified in internal medicine and pulmonary medicine who was one of the many doctors to physically examine Decedent in the early 1980s. Dahhan stated that Decedent died due to an upper GI bleed, possibly caused by the steroids he took for bronchospasms.[8] After reviewing all x-rays and medical records, Dahhan concluded:

> There is insufficient objective evidence to justify the diagnosis of coal worker's pneumoconiosis . . . . [H]is death was contributed to greatly by his advanced chronic obstructive lung disease with no evidence that his death was contributed to or hastened by his exposure to coal dust or coal worker's pneumoconiosis.

(J.A. at 280.) Dr. Dale Sargent, board certified in pulmonary diseases and critical care, rendered an opinion similar to Dahhan's. Sargent noted that Decedent's blood gases showed severe hypoxemic hypercapnic respiratory failure on a

---

[7]As noted, under the now-discredited "true doubt" test, a claimant could establish the existence of pneumoconiosis if conflicts in the record among qualified physicians created "true doubt" about the presence of the disease.

[8]Dahhan previously examined Decedent in March of 1983, in connection with his living miner claim. Although Dahhan believed Decedent suffered from a pulmonary or respiratory impairment, Dahhan thought Decedent's continued smoking caused the problem because the pattern of impairment disclosed in pulmonary function studies, the absence of x-ray evidence of pneumoconiosis, and the presence of occasional crepitations on clinical examination all indicated disability induced by smoking, not coal dust.

chronic basis—a finding suggesting COPD due to smoking, not pneumoconiosis. According to Sargent:

> In my opinion, with a reasonable degree of medical certainty, [Decedent] had severe chronic obstructive pulmonary disease secondary to cigarette smoking. This is the diagnosis put forth by Dr. Woolum. In fact, coal worker's pneumoconiosis is not mentioned in Dr. Woolum's diagnostic impressions either at the time of admission or time of discharge. Chronic obstructive pulmonary disease and pulmonary emphysema can cause severe lung disease without characteristic chest x-ray changes of pneumoconiosis. Therefore, I believe the cause of this miner's respiratory impairment was pulmonary emphysema due to cigarette smoking, and not due to coal worker's pneumoconiosis.

(J.A. at 284.) Sargent also stressed that even assuming Decedent had pneumoconiosis, it did not cause his death. Sargent wrote:

> Very clearly, this man died of an acute event (gastrointestinal bleeding) during the time he was hospitalized in July 1993. There is no post mortem examination, so the cause of the death is conjectural. Nevertheless, this man had been bleeding recurrently during his hospitalization and it is certainly possible that he died from acute gastrointestinal bleeding. Dr. Woolum thought that another possibility for cause of death was pulmonary embolism. None of the physicians caring for the patient at this point indicated that [Decedent] died due to either his lung disease or to coal worker's pneumoconiosis. Therefore, the cause of death is either gastrointestinal bleeding or pulmonary embolism, neither of which have been shown to be caused by pneumoconiosis or chronic obstructive pulmonary disease.

(J.A. at 285.)  In his decision, ALJ Kichuk disregarded the conflicting x-ray analyses, observing that the "evidence of record does not indicate that [Respondent] has established the presence of complicated coal workers' pneumoconiosis by chest x-ray." (J.A. at 31.)  Judge Kichuk also noted the lack of any biopsy or autopsy evidence to support a diagnosis of pneumoconiosis.

Nevertheless, ALJ Kichuk found Respondent's position more compelling.  ALJ Kichuk said that Woolum's opinion:

[was the] most reasoned and persuasive . . . because it includes the most comprehensive analysis of all the elements of the miner's occupational and medical history.  Moreover, Dr. Woolum personally treated the miner and was his principal caregiver for fourteen (14) years, from 1979, until [Decedent] passed away in July of 1993.  His treatment of [Decedent] over the years is fully and painstakingly documented in the record, which includes, but is not limited to, thirteen (13) hospitalizations (at least five for acute respiratory failure) and each time conducting chest x-rays, EKGs, and arterial blood gas studies.  From January of 1990, Dr. Woolum also diagnosed [Decedent] with *cor pulmonale* and end-stage chronic obstructive pulmonary disease.

I accord greatest weight to Dr. Woolum's opinion, not simply because he was the miner's treating physician for many years, but because he based his medical opinion upon numerous objective studies obtained during the miner's multiple hospital admissions for acute respiratory distress.  In sum, Dr. Woolum specifically identified the studies and observations upon which he relied and the conclusions he reached are consistent with and supported by the underlying objective evidence of record.

(J.A. at 35.)  ALJ Kichuk added that he did not believe Woolum's opinion was a "gratuity extended to a patient by a sympathetic treating physician." (*Id.*)

When the BRB affirmed, Petitioner timely appealed to this Court.

## DISCUSSION

This appeal presents issues of administrative practice and procedure that are mixed questions of law and fact.  We review questions of law *de novo*. *Peabody Coal Co. v. Greer*, 62 F.3d 801, 804 (6th Cir. 1995) ("This Court has plenary authority to review the Board's legal conclusions.") (citing *Gibas v. Saginaw Mining Co.,* 748 F.2d 1112, 1119 (6th Cir.1984)).  To the extent we must review factual conclusions as well, we do so with much greater deference.  33 U.S.C. § 921(b)(3).  This Court will affirm an ALJ's factual findings when substantial evidence supports those conclusions. *Consolidation Coal Co. v. Worrell*, 27 F.3d 227, 230-31 (6th Cir. 1994).  Where, however, an ALJ has improperly characterized the evidence or failed to account of relevant record material, deference is inappropriate and remand is required.[9] *Dir., OWCP v. Rowe*, 710 F.3d 251, 255 (6th Cir. 1983).  From the outset, we note that claimants have the burden of proof in black lung benefit proceedings.  The Black Lung Benefits Act, 30 U.S.C. §§ 901-62 (1994), creates an

---

[9]Technically, this Court is reviewing the BRB's decision affirming the ALJ, not the ALJ's decision itself.  Thus, we do not consider whether the BRB's decision was supported by substantial evidence, but whether the BRB correctly concluded that substantial evidence supported the ALJ's decision. *See, e.g., Zimmerman v. Dir., OWCP,* 871 F.2d 564, 567 (6th Cir. 1989); *Bizzarri v. Consolidation Coal Co.*, 775 F.2d 751, 753 (6th Cir. 1985).  The standards of review are the same. *Cross Mountain Coal, Inc. v. Ward*, 93 F.3d 211, 215 (6th Cir. 1996) ("The standards of review for the BRB and this court are the same.") (citing *Welch v. Benefits Review Bd.*, 808 F.2d 443, 445 (6th Cir.1986) (per curiam)).  This Court reviews the legal issues *de novo* but affords deference to relevant factual findings.

adversarial administrative procedure designed to require mining companies to pay those miners (or the survivors of those minors) who legitimately suffer from a class of different coal dust-related pulmonary injuries commonly categorized as pneumoconiosis. Petitioner is eligible for benefits if pneumoconiosis caused or "hasten[e]d the miner's death."[10] 20 C.F.R. § 718.205(c)(5). Congress defined "pneumoconiosis" as a "chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment." 30 U.S.C. § 902(b) (1994).

---

[10]In its entirety, the applicable regulation reads:

(c) For the purpose of adjudicating survivors' claims filed on or after January 1, 1982, death will be considered to be due to pneumoconiosis if any of the following criteria is met:

(1) Where competent medical evidence establishes that pneumoconiosis was the cause of the miner's death, or

(2) Where pneumoconiosis was a substantially contributing cause or factor leading to the miner's death or where the death was caused by complications of pneumoconiosis, or

(3) Where the presumption set forth at § 718.304 is applicable.

(4) However, survivors are not eligible for benefits where the miner's death was caused by a traumatic injury or the principal cause of death was a medical condition not related to pneumoconiosis, unless the evidence establishes that pneumoconiosis was a substantially contributing cause of death.

(5) Pneumoconiosis is a "substantially contributing cause" of a miner's death if it hastens the miner's death.

20 C.F.R. § 718.205. The presumptions in § 718.304 apply only when a claimant can offer certain medical evidence, and Respondent does not claim that any of the presumptions applies in this case. *See* 20 C.F.R. § 718.304.

Department of Labor (DOL) regulations help further describe "pneumoconiosis" by providing an illustrative listing of diseases that pneumoconiosis includes:

For the purpose of the Act, pneumoconiosis means a chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment. This definition includes, but is not limited to, coal workers' pneumoconiosis, anthracosilicosis, anthracosis, anthrosilicosis, massive pulmonary fibrosis, progressive massive fibrosis, silicosis, or silicotuberculosis, arising out of coal mine employment.

20 C.F.R. § 718.201 (1997). As this regulation makes clear, legal "pneumoconiosis" encompasses medical conditions other than clinical pneumoconiosis. *See, e.g., Nance v. Benefits Review Bd.*, 861 F.2d 68, 71 (4th Cir. 1988). Clinical or medical pneumoconiosis is a lung disease caused by fibrotic reaction of the lung tissue to inhaled dust that is generally visible on chest x-ray films. *See, e.g., Usery v. Turner-Elkhorn Mining Co.*, 428 U.S. 1, 6-7 (1976). Legal pneumoconiosis includes all lung diseases meeting the regulatory definition of any lung disease that is significantly related to, or aggravated by, exposure to coal dust. *See, e.g., Hobbs v. Clichfield Coal Co.*, 917 F.2d 790, 791 (4th Cir. 1990).

Under DOL regulations, a claimant may establish legal pneumoconiosis by any of four different methods of proof: (1) x-ray evidence; (2) autopsy or biopsy evidence; (3) evidence of complicated medical pneumoconiosis or progressive massive fibrosis; or (4) reasoned and documented medical opinions. 20 C.F.R. § 718.202(a)(1)-(4). As noted, the claimant bears the burden of proof. *Greenwich Collieries*, 512 U.S. at 281. The presence of evidence favorable to the claimant or even a tie in the proof will not suffice to meet that burden. *Id.*

Despite a certain degree of lingering confusion among the courts of appeals, it has become overwhelmingly evident that the testimony of the "treating physician" receives no additional weight. Sometimes termed the "treating physician rule," claimants have argued that the treating physician's analysis should receive greater significance in ALJ decisions (if not dispositive weight) relative to analyses performed by other experts.

In addition to the black lung context, the "treating physician rule" plays a role in Social Security proceedings pursuant to regulations that stipulate that the Commissioner of Social Security must give special weight to the claimant's treating physician when determining whether a claimant deserves disability benefits. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2002). Courts have also applied the "treating physician rule" in disability determinations under employee benefit plans covered by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001-53. *See, e.g., Darland v. Fortis Benefits Ins. Co.*, 317 F.3d 516, 533 (6th Cir. 2003), *overruled by Black & Decker Disability Plan v. Nord*, 123 S.Ct. 1965 (2003) (Ginsburg, J.) (criticizing, in an opinion by a unanimous Court, the usefulness of granting deference to the opinion of a treating physician).

In *Black & Decker Disability Plan v. Nord*, 123 S.Ct. at 1969, the Supreme Court recently reversed a Ninth Circuit decision, *Nord v. Black & Decker Disability Plan*, 296 F.3d 823, 831 (9th Cir. 2002), that afforded deference to treating physicians in ERISA-related disability determinations. Although *Black & Decker* dealt with ERISA, the unanimous Court disapproved of the "treating physician rule" with language that criticizes the principle itself, rather than its operation in an ERISA context. *See Black & Decker*, 123 S.Ct. at 1971. As Justice Gisburg explained, ERISA regulations that require a "full and fair" assessment of claims "do not command plan administrators to credit the opinions of treating physicians over other evidence relevant to the

claimant's medical condition."[11]    *Id*. at 1967.   The Court explained in detail:

> The question whether a treating physician rule would increase the accuracy of disability determinations under ERISA plans . . . seems to us one the Legislature or superintending administrative agency is best positioned to address. As compared to consultants retained by the plan, it may be true that treating physicians, as a rule, have a greater opportunity to know and observe the patient as an individual. Nor do we question the . . . concern that physicians repeatedly retained by benefits plans may have an incentive to make a finding of 'not disabled' in order to save their employers money and to preserve their own consulting arrangements. But the assumption that the opinions of a treating physician warrant greater credit than the opinions of plan consultants may make scant sense when, for example, the relationship between the claimant and the treating physician has been or short duration, or when a specialist engaged by the plan has expertise the treating physician lacks. And if a consultant engaged by a plan may have an "incentive" to make a finding of "not disabled," so a treating physician, in a close case, may favor a finding of "disabled." Intelligent resolution of the question of whether routine deference to the opinion of a claimant's treating physician would yield more accurate disability

---

[11]As noted, Social Security benefit determinations are governed by regulations that require deference to treating physicians, *see* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2), while neither ERISA nor Black Lung regulations contain a similar requirement. The *Black & Decker* Court noted that deference to treating physicians makes more sense in the Social Security context because "[p]resumptions employed by the [Social Security] Commissioner's regulations grow out of the need to administer a large benefits system efficiently." *Id.* at 1971 (quotation omitted). This rationale is inapplicable to the black lung benefits scheme, which affects dramatically fewer people and whose remaining claimants will decrease naturally as time passes.

determinations, it thus appears, might be aided by empirical investigation of the kind courts are ill-equipped to conduct.

*Id*. at 1971 (internal quotations and citations omitted). The Court thus notes that treating physicians may have strong pro-claimant biases and lack the expertise held by non-treating doctors. These critiques of the "treating physician rule" apply with equal force to the notion that treating physicians should receive deference in black lung proceedings.

In fact, the courts of appeals, including this one, have often recognized that there is no "treating physician rule" in black lung cases, although this Court's jurisprudence is somewhat equivocal. In *Tussey v. Island Creek Coal Co.*, 982 F.2d 1036 (6th Cir. 1993), this Court wrote that "opinions of treating physicians are entitled to greater weight than those of non-treating physicians." *Id*. at 1042. Subsequently, however, we withdrew from the language in *Tussey*, explaining that *Tussey* "did not suggest that treating physicians should automatically be presumed to be correct—we indicated that their opinions should be 'properly credited and weighed.'"[12] *Peabody Coal Co. v. Groves*, 277 F.3d 829, 834 (6th Cir. 2002) (quoting *Tussey*, 982 F.2d at 1042). In another case more recent than *Peabody Coal*, we unambiguously stated that "*the misconceived 'treating physician presumption' does not exist*." *Wolf Creek Collieries v. Dir., OWCP*, 298 F.3d 511, 521 (6th Cir. 2002) (emphasis added); *see also Jericol Mining, Inc. v. Napier*, 301 F.3d 703, 709 (6th Cir. 2002) (quoting *Nat'l Mining Ass'n v. Dep't of Labor*, 292 F.3d 849, 861 (D.C. Cir. 2002), for the proposition that "'[t]he consensus among courts has been that an agency adjudicator

---

[12]Judge Kennedy still dissented from *Peabody Coal v. Groves*, explaining that she saw "no reason why a treating physician's opinion that one condition caused or contributed to another should be accepted in the face of expert opinions to the contrary, at least where there is no logical explanation for doing so offered by the ALJ." 277 F.3d at 837 (Kennedy, J., dissenting).

may give weight to the treating physician's opinion when doing so makes sense in light of the evidence and the record, but may not mechanistically credit the treating physician solely because of his relationship with the claimant"); *Griffith v. Dir., OWCP*, 49 F.3d 184, 187 (6th Cir. 1995) (citing *Tussey* for the Court's conclusion that "under these circumstances, the ALJ was not required to give greater weight to the opinion of the treating physician").

Other circuits have also rejected the treating physician rule in black lung litigation. *See, e.g., Kennellis Energies, Inc. v. Hallmark*, __ F.3d __, 2003 WL 21464596, at *6 (7th Cir. 2003) ("[A] preference or the treating physician's opinion . . . has been rejected by this Circuit.") (citations omitted); *Peabody Coal Co. v. McCandless*, 255 F.3d 465, 469 (7th Cir. 2001) (calling a treating physician preference "irrational," in part because "[t]reating physicians often succumb to the temptation to accommodate their patients (and their survivors) at the expense of third parties such as insurers, which implies attaching a discount rather than a preference to their views"); *Lango v. Dir., OWCP*, 14 F.3d 573, 576-77 (3d Cir. 1997) (finding treating physician's conclusory statement that coal miner's pneumoconiosis hastened his death did not support black lung benefits claim). As the Fourth Circuit explained:

Neither this circuit nor the Benefits Review Board has ever fashioned either a requirement or a presumption that treating or examining physicians' opinions be given greater weight than opinions of other expert physicians. We have often stated that as a general matter the opinions of treating and examining physicians deserve especial consideration. We stated, for example, in *Hubbard v. Califano*, 582 F.2d 319, 323 (4th Cir.1978), that "[we] place[ ] great reliance on a claimant's treating physician," and, citing *Hubbard*, in *King v. Califano*, 615 F.2d 1018, 1020 (4th Cir.1980), that "[we] place[ ] great reliance on the conclusions of a claimant's examining physician." In neither case, however, did we suggest, much less hold,

that the opinions of treating or examining physicians must be accorded greater weight than opinions of other physicians. It is, of course, one thing to say that we give great weight to the treating or examining physician's opinion; it is quite another to say that as a matter of law we give greater weight to such an opinion than to opinions by other physicians. The ALJ therefore was not required to defer to Dr. Soliva's diagnoses or to accord them greater weight than the opinions of the other physicians.

*Grizzle v. Pickands Mather & Co./Chisolm Mines*, 994 F.2d 1093, 1097-98 (4th Cir. 1993); *see also Island Creek Coal Co. v. Compton*, 211 F.3d 203, 212 (4th Cir. 2000) ("An ALJ may not discredit a physician's opinion solely because the physician did not examine the claimant."). Thus, most courts do not afford additional deference to treating physicians.

The Department of Labor recently promulgated regulations with respect to the role treating physicians should play in black lung benefit determinations, but these rules do little more than explain that sometimes a treating physician may "have a thorough understanding of a miner's condition," but in other cases, ALJs should not rely on the opinions of treating physicians. *See* 20 C.F.R. § 718.104(d)(2002). Rejecting "automatic acceptance" of the treating physician's opinion, the DOL intended the rule "to force a careful and thorough assessment of the treating relationship." *Regulations Implementing the Federal Coal Mine and Safety Act of 1969, as Amended*, 65 FED. REG. 79,920, 79,932 (Dec. 20, 2000) [hereinafter *Implementing Regulations*]. To effectuate this end, the DOL's regulation states:

(d) Treating physician. In weighing the medical evidence of record relevant to whether the miner suffers, or suffered, from pneumoconiosis, whether the pneumoconiosis arose out of coal mine employment, and whether the miner is, or was, totally disabled by pneumoconiosis or died due to pneumoconiosis, the

adjudication officer must give consideration to the relationship between the miner and any treating physician whose report is admitted into the record. Specifically, the adjudication officer shall take into consideration the following factors in weighing the opinion of the miner's treating physician:

(1) Nature of relationship. The opinion of a physician who has treated the miner for respiratory or pulmonary conditions is entitled to more weight than a physician who has treated the miner for non-respiratory conditions;

(2) Duration of relationship. The length of the treatment relationship demonstrates whether the physician has observed the miner long enough to obtain a superior understanding of his or her condition;

(3) Frequency of treatment. The frequency of physician-patient visits demonstrates whether the physician has observed the miner often enough to obtain a superior understanding of his or her condition; and

(4) Extent of treatment. The types of testing and examinations conducted during the treatment relationship demonstrate whether the physician has obtained superior and relevant information concerning the miner's condition.[13]

---

[13] The regulation did not become effective until December 20, 2000, so the ALJ did not have its benefit when he made his decision. The BRB, however, issued the decision presently under review on January 31, 2001.

20 C.F.R. § 718.104(d) (2001). The regulation says *nothing* about prioritizing a treating physician's perspective;[14] rather, the regulation expects ALJs to analyze the nature and duration of the doctor-patient relationship along with the frequency and extent of treatment. This is similar to the kind of critical analysis an ALJ should apply when considering any expert opinion. The DOL further expects ALJs to weigh the report of a treating physician "against all other relevant evidence in the record." *Implementing Regulations*, 65 FED. REG. at 79,934.

A simple principle is evident: in black lung litigation, the opinions of treating physicians get the deference they deserve based on their power to persuade. *Cf. Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (affording an administrative agency pronouncement only the weight it deserved in light of

---

[14]Contrast the black lung regulation to the Social Security rule that deals with treating physicians:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(d)(2). This further exemplifies the relevance of the distinction the *Black & Decker* Court drew between ERISA and Social Security. The Court, in effect, excused the treating physician rule in the Social Security context because of the above-quoted regulatory mandate. *See Black & Decker*, 123 S.Ct. at 1971. The black lung situation, however, is much more like the ERISA issue before the *Black & Decker* Court because no regulation mandates that either plan administrators or ALJs handling black lung cases give treating physicians deference.

---

"the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade"). For instance, a highly qualified treating physician who has lengthy experience with a miner may deserve tremendous deference, whereas a treating physician without the right pulmonary certifications should have his opinions appropriately discounted. The case law and applicable regulatory scheme make clear that ALJs must evaluate treating physicians just as they consider other experts.

As explained, Respondent may prove her case through autopsy or biopsy evidence, x-ray evidence, evidence of complicated medical pneumoconiosis or progressive massive fibrosis, or reasoned and documented medical opinions. 20 C.F.R. § 718.202(a)(1)-(4). Since Respondent offered no autopsy or biopsy evidence, we may move directly to Decedent's x-rays.

Writing that the "evidence of record does not indicate that [Respondent] has established the presence of complicated coal workers' pneumoconiosis by chest x-ray," the ALJ never relied on x-ray evidence. (J.A. at 31.) This is unsurprising given the paucity of x-ray analyses that support Respondent's position. Only one of the six fully-credentialed readers found pneumoconiosis, and he did so based on a film taken ten years before Decedent died.[15] (J.A. at 30-31.) Less

---

[15]And even the ALJ gave that reader's opinion "little or no weight" because Simmons, the reader:

> vacillates in his deposition testimony as to whether he believes the miner had pneumoconiosis. Despite his status as a board-certified radiologist and a B reader, he was unable to make a final determination on the existence or non-existence of coal workers' pneumoconiosis (CWP), as evidenced by his testimony. He first states that he read the chest x-ray as positive for CWP, but then states that his was probably "overreading."

(J.A. at 32.)

qualified x-ray analysts reached myriad results, but the ALJ permissibly considered the readers' respective qualifications and appropriately discounted the opinions of those not fully qualified. *See Staton v. Norfolk & W. Ry.*, 65 F.3d 55, 59 (6th Cir. 1995).

In addition to Woolum's two letters, the ALJ considered opinions from eight other physicians. For simplicity, one can group these eight physicians into two categories: those Respondent argues support her (Clarke, Penman, Powell, and Wright); and those who back Petitioner's position (Simmons, Powell, Anderson, Sargent, and Dahhan).

As the ALJ appropriately recognized, three of the opinions offered by Respondent's group (Clarke, Penman and Powell) have very little significance because they "did not conduct complete pulmonary evaluations of the miner" and "these physicians based their opinions on the x-ray evidence, which I have previously found not sufficient to establish the existence of CWP [Coal Workers' Pneumoconiosis]."[16] (J.A. at 32-33.) As we have concluded before, merely restating an x-ray does not qualify "as a reasoned medical judgment." *Cornett v. Benham Coal, Inc.*, 27 F.3d 569, 576 (6th Cir. 2000). Furthermore, an ALJ may not rely on a doctor's opinion that a patient has medical pneumoconiosis when the physician bases his opinion entirely on x-ray evidence the ALJ has already discredited. *Island Creek*, 211 F.3d at 211-12; *Sahara Coal Co. v. Fitts*, 39 F.3d 781, 783 (7th Cir. 1994).

Although still problematic, Wright offered the most persuasive testimony on Respondent's behalf. He based his conclusion partly on a putatively positive x-ray taken on March 30, 1985, but also on pulmonary function studies

---

[16]Powell and Penman evidently based their conclusions on film taken on November 26, 1984, and Clarke based his analysis on x-rays taken the following day.

revealing severe restrictive and obstructive defects and arterial blood gas studies that indicated substantial impairments. On this basis, the ALJ gave greater weight to Wright's opinion "on the issue of the existence of pneumoconiosis." (J.A. at 35.) But Wright's opinion is troubling because he only maintains board certifications in anesthesiology and pain management, neither of which is germane here. Moreover, Wright testified that pneumoconiosis was a substantial and contributing factor that led to the problems detected by the pulmonary function studies and blood gas tests, but Wright also stated that cigarette smoking was the predominant cause of Decedent's lung disease. Wright testified:

COUNSEL:  Getting right down to the nitty-gritty in this, Doctor, you don't think this man's very poor pulmonary function is a result of [medical] pneumoconiosis, do you?

WRIGHT:  No.

COUNSEL:  What is your opinion as their cause? [sic]

WRIGHT:  His chronic obstructive lung disease with emphysema.

COUNSEL:  And in your opinion, what is the most probable or predominant cause of that disease?

WRIGHT:  The predominant cause is probably cigarette smoking.

(Dep. 21 at 362.) Even if one understands Wright to mean that smoking caused most of the problem, but medical pneumoconiosis still contributed to Wright's poor pulmonary condition—that says nothing about the ultimate issue, which is whether legal pneumoconiosis *hastened Decedent's death*. Recall that the ALJ concluded his discussion of Wright's

testimony by explaining that he gave great weight to Wright's opinion "on the issue of the *existence* of pneumoconiosis." (J.A. at 35) (emphasis added). Wright never testified that pneumoconiosis (legal or medical) hastened Decedent's demise.

The conclusions reached by Petitioner's group of experts are somewhat more useful. The ALJ reasonably discounted Simmons' contribution because Simmons seemed "equivocal at best." (J.A. at 32.) The ALJ also discredited Anderson's opinion because he did not do pulmonary function studies on the miner and only "suspected" smoking caused the COPD. Sargent's opinion, however, is more helpful, because Sargent, board-certified in pulmonary medicine, expressly concluded that pneumoconiosis did not cause the miner's death. The ALJ criticized Sargent's analysis because Sargent never examined Decedent and evidently relied on an incomplete medical file that did not include pulmonary function studies. Nevertheless, Sargent concluded that

> Very clearly, this man died of an acute event (gastrointestinal bleeding) during the time he was hospitalized in July 1993. . . . Dr. Woolum thought that another possibility for cause of death was pulmonary embolism. . . . Therefore, the cause of death is either gastrointestinal bleeding or pulmonary embolism, neither of which have been shown to be caused by pneumoconiosis or chronic obstructive pulmonary disease.

(J.A. at 285.) Again, the ultimate question is not whether Decedent had medical or legal pneumoconiosis, but whether legal pneumoconiosis hastened his death. Even assuming, *arguendo*, that access to pulmonary function studies would have caused Sargent to reconsider his opinion that the miner did not have medical pneumoconiosis, this ancillary point does not implicate Sargent's two primary conclusions articulated in the above-quoted passage: (1) the miner died of an acute event, probably gastrointestinal bleeding but perhaps

a pulmonary embolism; and (2) neither pneumoconiosis nor COPD causes either gastrointestinal bleeding or pulmonary embolism. Therefore, Sargent concluded that pneumoconiosis, even if it existed, did not cause the miner's death.

The ALJ also struggled to dispatch with Dahhan's opinion. Dahhan, board-certified in pulmonary medicine, found no medical pneumoconiosis. The ALJ's analysis of Dahhan's reasoning is somewhat desultory, but he seems to criticize Dahhan for "fail[ing] to adequately explain why the miner's 37 year [mining] history has nothing to do with his lung condition," and for neglecting that COPD falls within the definition of "legal" pneumoconiosis. (J.A. at 34.) It makes no sense, however, to assume that because Dahhan does not explain why Decedent's work as a miner has not caused his lung impairment, then his work as a miner must have caused his lung impairment.[17] Furthermore, although Dahhan concluded that the miner had COPD, only COPD caused by coal dust constitutes legal pneumoconiosis. *See* 20 C.F.R. § 718.201(a)(2). Otherwise, everyone who developed COPD from smoking would have legal pneumoconiosis. Dahhan concluded that the miner's "death was contributed to greatly by his advanced chronic obstructive lung disease *with no evidence that his death was contributed to or hastened by his exposure to coal dust* or coal worker's pneumoconiosis." (J.A. at 280) (emphasis added.)

Thus, Dahhan did not, as the ALJ claims, ignore COPD. Rather, Dahhan stated that coal dust did not cause the COPD. Most important, Dahhan appropriately addressed the real issue when he explained that "[Decedent's] death would have been at the same time and the same manner regardless of his

---

[17]When Dahhan first examined Decedent in 1983, Dahhan concluded that smoking caused Decedent's pulmonary problems. Likewise, Sargent explained that Decedent's blood gases showed severe hypoxemic hypercapnic respiratory failure on a chronic basis—a finding that indicates COPD caused by smoking, not pneumoconiosis.

exposure to coal dust or the presence of occupational pneumoconiosis, since it was the result of an upper GI bleed, [a] condition of the general public at large." (J.A. at 281.)

If one analyzed the evidence without the treating physician's opinion, it would be evident that substantial evidence does not support the ALJ's conclusion that Respondent met her burden of proof. Consider the evidence without Woolum's input: Respondent offered no biopsy or autopsy reports. Five of the six fully-qualified x-ray readers saw no pneumoconiosis, and the sixth (Simmons) was indecisive. None of the other medical evidence is incredibly compelling. The dispositive question is whether legal pneumoconiosis contributed to the miner's death. Only two physicians (Sargent and Dahhan), both specialists in pulmonary medicine, addressed this issue, and both concluded that coal dust-related disorders (legal pneumoconiosis) did not hasten Decedent's death.

In fact, without Woolum's contribution, Petitioner would have no argument but to infer that Decedent must have suffered from legal pneumoconiosis because he worked for decades as a miner, and since he had legal pneumoconiosis, it must have contributed to his death. Since this baseless statement is grossly insufficient, the supportability of the ALJ's conclusion depends on Woolum, the treating physician.[18]

---

[18]Respondent effectively concedes this. Again, the only relevant issue is whether legal pneumoconiosis hastened Decedent's death. In her brief, Respondent writes:

> With respect to the issue of whether pneumoconiosis hastened [Decedent's] death, the record contains five (5) sources of evidence, including: the treatment notes of Dr. Jerry Woolum, the miner's treating physician; the death certificate; the testimony of Petitioner [Decedent's wife]; the consultative report of Dr. Dahhan and the consultative report of Dr. Sargent.

(Pet'r Br. at 17.) Notably, Respondent neglects to mention the various

Woolum's testimony suffers from several serious problems that render his opinion an inadequate basis for the ALJ's conclusion unless his hypothesis receives disproportionately great weight simply because he worked as Decedent's treating physician. Since no such presumption exists, there is no substantial evidence supporting the ALJ's conclusion.

Circumstantial factors strongly indicate that Woolum changed his original opinion to meet Respondent's needs. As summarized above, the original ALJ, Judge Rippey, held a pre-hearing conference between the parties on February 14, 1995. At that session, ALJ Rippey told Respondent's counsel that he found Woolum's initial letter insufficient to establish that pneumoconiosis played a role in Decedent's death. Woolum's first analysis stated "that this gentleman was disabled secondary to his lung disease of which pneumoconiosis, in my mind, was certainly a contributing factor." (J.A. at 72.) Woolum did not claim pneumoconiosis caused the miner's death.

After Respondent's attorney learned that Woolum's initial conclusion would not suffice, Woolum drafted a new letter, this time reckoning that, "within a reasonable degree of medical probability," pneumoconiosis "hastened [Decedent's] death." (*Id.*) Woolum wrote the first letter on February 24, 1994, but did not write the second memorandum until March 10, 1995—less than a month after the parties met with ALJ Rippey. Woolum treated Decedent for fourtneen years, but did not diagnose him with pneumoconiosis until after he allegedly died from it.

---

tidbits of x-ray and medical evidence that she emphasizes elsewhere. The death certificate lists the cause of death as a pulmonary embolism, caused by COPD, itself due to an acute intestinal bleed. COPD qualifies as a type of legal pneumoconiosis only when caused by coal dust, not an acute intestinal bleed. Respondent herself has no medical knowledge and an obvious bias. The ALJ did not rely on her description of Decedent. That leaves only Sargent and Dahhan, who aid Petitioner's case, and Woolum, the treating physician.

This seems like a case in which the treating physician wanted to help his patient's family. Despite Woolum's almost certainly benevolent intent, the sequence of events makes his new conclusion dubious.[19]

Notwithstanding Woolum's significant credibility problem, there are other reasons to doubt his conclusion. First, as ALJ Rippey noted, even in his second letter, Woolum could only conclude with "a reasonable degree of medical *probability*" that pneumoconiosis contributed to the miner's death, rather than the usual phrase, "reasonable degree of medical *certainty*." (J.A. at 255-56.) (emphasis added.) It is unclear what "reasonable degree of medical probability" means. The more common "reasonable degree of medical certainty" already reflects the incertitude inherent in medical conclusions—"certainty" in medicine only means "nearly sure" relative to the existential sense of the word "certain." If a "medical certainty" is a conviction short of complete certainty, then a "medical probability" must mean something even less sure.

Second, Woolum attempted to connect the pulmonary embolism to Decedent's mining history by surmising that, although the pulmonary embolus directly caused the miner's death, pneumoconiosis hastened his demise because the miner's "lack of oxygen [and] his retained carbon dioxide all played an effect on all parts of his body." (J.A. at 277.) Put differently, Woolum argued that because Decedent had

---

[19]One could view the ALJ's decision to credit Woolum's testimony despite the surrounding circumstances as a "clearly erroneous" factual decision, but the ALJ is a judge of credibility and, however awkward the situation, the ALJ may have believed Woolum always intended to express his honest belief that legal pneumoconiosis caused the miner's death. Even so, the problem with the proceedings below is more legal mistake that factual error—assuming Woolum's opinion deserved some weight, it does not alone constitute substantial evidence in Respondent's favor unless the ALJ and the BRB afforded the treating physician's opinion much greater significance that its inherent persuasive value warrants.

pneumoconiosis, his body lacked oxygen and excessively retained carbon dioxide. This weakened the miner, "played an effect on all parts of his body," and thereby hastened a death that would have occurred anyway from the pulmonary embolus. (*Id.*) Even if this is an accurate medical conclusion, it is legally inadequate.

Again, Petitioner must show that pneumoconiosis "hasten[e]d the miner's death." 20 C.F.R. § 718.205(c)(5). One can always claim, as Woolum did, that if pneumoconiosis makes someone weaker, it makes them less resistant to some other trauma. If, for instance, a miner with pneumoconiosis gets hit by a train and bleeds to death, Woolum (or someone adopting his position) would argue that the pneumoconiosis "hastened" his death because he bled to death somewhat more quickly than someone without pneumoconiosis. This is absurd, of course, and presumably not what Congress meant by "hasten." Under Woolum's interpretation, pneumoconiosis would virtually always "hasten" death to at least some minimal degree. Legal pneumoconiosis only "hastens" a death if it does so through a specifically defined process that reduces the miner's life by an estimable time. Woolum's letter is conclusory and inadequate because Woolum just asserts that because (in Woolum's opinion) the miner had pneumoconiosis, the disease must have hastened his death.

Third, the ALJ ignores Woolum's credentials. Woolum has no special expertise in reading x-rays, but the ALJ gave weight to Woolum's x-ray analysis that he did not give to the fully-credentialed readers who found no evidence of medical pneumoconiosis. Woolum has no board certification in pulmonary medicine, but the ALJ accepted Woolum's assertion that a coal dust-related ailment contributed to the miner's demise over the opinions of two board-certified pulmonary specialists who reached the opposite conclusion.

Although the DOL's new regulations regarding treating physicians did not take effect until after the ALJ reached his

decision, they would not alter the outcome of this case. Under the new regulations, the ALJ must consider a multitude of factors that, viewed overall, simply ask whether the treating physician has offered a persuasive opinion. *See* 20 C.F.R. § 718.104(d). In this case, he did not. To reach his conclusion, the ALJ had to give preference to the treating physician. Since that is impermissible, the BRB erred in affirming the ALJ's decision.[20]

---

[20]There is another concerning issue, perhaps only a minor procedural quirk. To receive benefits as a survivor, Respondent must show at least that legal pneumoconiosis "hasten[e]d the miner's death." 20 C.F.R. § 718.205(c)(5). The initial opinion drafted by ALJ Kichuk concluded that "the miner's pneumoconiosis was a contributing factor in causing his death." In its second remand, the BRB instructed ALJ Kichuk "to [re]consider whether the existence of pneumoconiosis is established." (J.A. at 47.) It seems unlikely and bizarre that the BRB could have meant for the parties to relitigate the existence of legal pneumoconiosis but not whether it caused the miner's death. Put differently, it would be odd for the BRB to have effectively concluded that "we don't know whether the miner had pneumoconiosis, but if he did, it must have contributed to his death." On the second remand, the parties litigated both existence and causation. The ALJ concluded that Respondent met her burden of establishing the existence of legal pneumoconiosis," but he never decided whether he also thought Respondent met her burden of establishing that legal pneumoconiosis contributed to the miner's death. Yet, in the third BRB opinion (affirming the second remand), the BRB concluded that "[i]nasmuch as the administrative law judge's determination that claimant established the existence of pneumoconiosis . . . *and death due to pneumoconiosis* . . . is supported by substantial evidence, we affirm the administrative law judge's award of survivor's benefits." (J.A. at 15) (emphasis added.) Since the ALJ opinion then under review never concluded anything about causation, one wonders how the BRB could affirm the ALJ's conclusion that "death [was] due to pneumoconiosis." (*Id*.) This may render the BRB's third order unsupported by substantial evidence. The easiest solution may be to infer that the ALJ decision following the second remand indirectly addressed both existence and causation.

The whole issue is immaterial because Respondent did not offer any evidence of causation in the first two administrative hearings that she did not offer again in the third. And, since the third BRB order is properly before this Court, all conclusions drawn by that opinion are properly before us as well.

For all the aforementioned reasons, we **REVERSE** the Benefits Review Board.

---

The confusion, however, does emphasize the need for administrative bodies to make their opinions clear.