**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 16a0436n.06

No. 15-4301

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jul 29, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| ISLAND CREEK COAL COMPANY, | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| | ) | ON PETITION FOR REVIEW |
| v. | ) | OF AN ORDER OF THE |
| | ) | BENEFITS REVIEW BOARD |
| DENNY MARCUM; DIRECTOR, OFFICE | ) | |
| OF WORKERS' COMPENSATION | ) | |
| PROGRAMS; UNITED STATES | ) | **OPINION** |
| DEPARTMENT OF LABOR, | ) | |
| | ) | |
| **Respondents.** | ) | |
| | ) | |

**BEFORE:  MOORE, McKEAGUE, and DONALD, Circuit Judges.**

**KAREN NELSON MOORE, Circuit Judge.**  Denny Marcum worked in coal mines for thirteen years and suspects that he contracted pneumoconiosis during that time.  Marcum sought disability benefits under the Black Lung Benefits Act, 30 U.S.C. § 901 *et seq.*, and an Administrative Law Judge ("ALJ") found that he was entitled to them because Marcum's medical experts, who found that he had pneumoconiosis, were more credible than those put forth by his former employer, Island Creek Coal Company ("Island Creek").  Island Creek appealed to the Benefits Review Board ("Board"), which affirmed the award of benefits.  Island Creek now petitions this court for review, but we find that substantial evidence supported the ALJ's determination; therefore, we **DENY** the petition for review.

## I. BACKGROUND

Denny Marcum began working in coal mines in 1964, when he was seventeen years old. *See* Joint Appendix ("JA") at 240–41 (Hr'g Tr. at 13:24–14:2). He worked in coal mines from time-to-time between 1964 and 1985. *See id.* at 241–44 (Hr'g Tr. at 14:6–17:9). Island Creek was his last coal-mine employer, *id.* at 243–44 (Hr'g Tr. at 16:2–11, 17:5–14), and Marcum stopped working for Island Creek because he found that he "just couldn't breathe hardly," *id.* at 244 (Hr'g Tr. at 17:21). Marcum's breathing remains poor, *id.* at 244–45 (Hr'g Tr. at 17:22–18:1), and there is no dispute that he has severe breathing problems that preclude him from working in a coal mine ever again, *id.* at 65–66 (First Forehand Dep. at 46:22–47:1); *id.* at 185 (Fino Dep. at 22:4–7); *id.* at 223 (Jarboe Dep. at 32:21–24). Hotly disputed is whether this condition stems from pneumoconiosis. Marcum's medical history—he is a life-long heavy smoker, *id.* at 246–47 (Hr'g Tr. at 19:14–20:2); *id.* at 112–13 (Second Forehand Dep. at 9:22–10:7), and suffered blood clots in his lungs in 2009, *id.* at 36 (First Forehand Dep. at 17:4–8)—provides other potential causes for his pulmonary problems.

After Marcum's first application for black-lung benefits was denied in 2007, *id.* at 254 (ALJ Op. at 2), he submitted a new application in 2009. *See id.* at 3–6 (2009 Benefits Application). The ALJ held a hearing during which Marcum testified and the parties submitted medical records and depositions, and she subsequently awarded benefits to Marcum in a written opinion. *See id.* at 253–86 (ALJ Op.).

In her opinion, the ALJ weighed competing evidence regarding the length of Marcum's coal-mine employment history, finding that he "had at least 14 but less than 15 years of coal mine employment." *Id.* at 258 (ALJ Op. at 6). Because of this finding, Marcum was not eligible for the statutory presumption that his "totally disabling respiratory or pulmonary impairment" was "due to pneumoconiosis." 30 U.S.C. § 921(c)(4). Instead, Marcum needed to show that he had pneumoconiosis using medical evidence. The ALJ, therefore, thoroughly reviewed the medical record, which contained numerous x-rays, each of which had been interpreted by multiple doctors; the results of numerous pulmonary-function and arterial blood-gas tests; and the medical reports of four doctors. *See* JA at 259–75, 279–83 (ALJ Op. at 7–23, 27–31).

The ALJ first concluded that the x-rays "failed to establish that [Marcum] has pneumoconiosis." *Id.* at 279 (ALJ Op. at 27). This was so because each x-ray had been interpreted by at least one doctor to reflect the existence of pneumoconiosis, and by at least one other doctor not to. *See id.* at 278–79 (ALJ Op. at 26–27). The ALJ weighed the relative credentials of each doctor who reviewed a particular x-ray, and credited the interpretation of the more qualified expert. *See id.* Where the two sides were equally qualified, the ALJ considered the x-ray to be inconclusive. *Id.* As a result, the ALJ found that of the six x-rays in evidence, "one x-ray is positive, three are negative, and the remaining two are inconclusive," and that "the digital x-ray . . . is also inconclusive." *Id.* at 279 (ALJ Op. at 27).

The ALJ next discussed the medical opinions of four doctors. *See id.* at 264–75 (ALJ Op. at 11–23). Two of those doctors opined that Marcum had pneumoconiosis. Dr. Randolph

3

Forehand had examined Marcum three times, and based his diagnosis on these examinations, his view that the x-rays showed pneumoconiosis, and the results of testing showing that Marcum had "non-disabling mixed obstructive-restrictive disease, and disabling gas exchange impairment with exercise." *Id.* at 280 (ALJ Op. at 28). Dr. Thomas Splan's opinion was based on a single examination of Marcum, during which Dr. Splan also relied in part on a "positive reading of the digital x-ray" by another doctor. *See id.* at 281 (ALJ Op. at 29). Dr. Splan's conclusion was "that coal dust and cigarette smoking contributed to [Marcum's] obstructive disease and pneumoconiosis," and "that [Marcum's] history of pulmonary embolism contributed to his impairment, but to a lesser extent." *Id.* The ALJ did not credit the opinions of two other doctors—Dr. Gregory Fino and Dr. Thomas Jarboe—who found that Marcum did not suffer from pneumoconiosis because they each attributed the fact that Marcum suffered from poor arterial blood-gas testing to his smoking and granulomatous scarring, but neither explained why they had excluded coal dust as a potential contributing factor to the admittedly poor arterial blood-gas testing. *See id.* at 281–82 (ALJ Op. at 29–30).

Weighing these four opinions, the ALJ was persuaded by Drs. Forehand and Splan. Balancing that medical evidence against the inconclusive x-rays, the ALJ concluded that Marcum "has established that he has pneumoconiosis." *Id.* at 283 (ALJ Op. at 31). The ALJ thus found that Marcum was entitled to benefits. *See id.* at 285 (ALJ Op. at 32). The Benefits Review Board affirmed this decision, *id.* at 289–95 (Board Op.), and Island Creek petitioned this court for review, *see id.* at 296–300 (Notice of Appeal).

## II. ANALYSIS

"In reviewing an appeal from the Board, we review the Board's legal conclusions de novo." *Big Branch Res., Inc. v. Ogle*, 737 F.3d 1063, 1068 (6th Cir. 2013). "To the extent we must review factual conclusions as well, we do so with much greater deference" and "will affirm an ALJ's factual findings when substantial evidence supports those conclusions." *Eastover Mining Co. v. Williams*, 338 F.3d 501, 508 (6th Cir. 2003). "Substantial evidence is more than a mere scintilla, and must do more than create a suspicion of the existence of the fact to be established." *Piney Mountain Coal Co. v. Mays*, 176 F.3d 753, 756 (4th Cir. 1999) (quoting *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939)). In assessing the evidence, we are mindful that the burden of proof lies with the individual seeking benefits. *See Eastover Mining*, 338 F.3d at 508. But "[w]e do not reweigh the evidence or substitute our judgment for that of the ALJ," *Big Branch*, 737 F.3d at 1069 (quoting *Tenn. Consol. Coal Co. v. Kirk*, 264 F.3d 602, 606 (6th Cir. 2001)), so "we may affirm an ALJ's decision even though 'we would have taken a different view of the evidence were we the trier of facts,'" *id.* (quoting *Ramey v. Kentland Elkhorn Coal Corp.*, 755 F.2d 485, 486 (6th Cir. 1985)). When the challenge is to "whether the ALJ reached the correct result after weighing conflicting medical evidence, our scope of review is exceedingly narrow," *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995) (alteration omitted) (quoting *Consolidation Coal Co. v. Worrell*, 27 F.3d 227, 230 (6th Cir. 1994)), because "[d]etermining whether a 'doctor's report was sufficiently documented and reasoned is a credibility decision we have expressly left to the ALJ,'" *Island*

*Creek Ky. Mining v. Ramage*, 737 F.3d 1050, 1059 (6th Cir. 2013) (alterations omitted) (quoting *Tenn. Consol. Coal Co. v. Crisp*, 866 F.2d 179, 185 (6th Cir. 1989)).

A miner is entitled to benefits if: (1) he "[h]as pneumoconiosis," (2) "[t]he pneumoconiosis arose out of coal mine employment," (3) he "[i]s totally disabled," and (4) "[t]he pneumoconiosis contributes to the total disability." 20 C.F.R. § 725.202(d)(2). The first factor—the only factor at issue in this appeal, *see infra* at 12 n.3—may be proven by demonstrating that the miner has either clinical pneumoconiosis or legal pneumoconiosis. *See Eastover Mining*, 338 F.3d at 509; 20 C.F.R. § 718.201(a). Clinical pneumoconiosis includes "those diseases recognized by the medical community as pneumoconioses," while legal pneumoconiosis is a broader concept encompassing lung diseases caused by employment in coal mines. *See* 20 C.F.R. § 718.201(a). The existence of pneumoconiosis may be proven by, among other things, "[a] chest X-ray" or a finding by "a physician, exercising sound medical judgment, notwithstanding a negative X-ray, [who] finds that the miner suffers or suffered from pneumoconiosis." 20 C.F.R. § 718.202(a). Although x-rays are often helpful in diagnosing pneumoconiosis, "[a] claim for benefits must not be denied solely on the basis of a negative chest X-ray." 20 C.F.R. § 718.202(b).

Island Creek argues that the ALJ erred in three ways: (1) by inappropriately altering the burden of proof in assessing the x-ray evidence; (2) by failing to provide adequate reasoning for crediting the opinions of Drs. Forehand and Splan; and (3) by discrediting Drs. Fino and Jarboe for reasons that were not supported by substantial evidence. We disagree.

**A. The ALJ's "Rule Out" Statement Did Not Shift the Burden of Proof.**

After concluding that the x-ray evidence failed to support Marcum's claim, the ALJ noted that, of the more recent x-rays, "one is positive, one is negative, and three, including the digital x-ray, are inconclusive." JA at 279 (ALJ Op. at 27). This conclusion, the ALJ found, meant that "the recent x-ray evidence does not rule out the presence of simple clinical pneumoconiosis." *Id.* Island Creek suggests that this statement "shifts the burden of proof," because the phrase "rule out" is a term of art that refers to a burden that is placed on the employer when a coal miner is entitled to a legal presumption that he has pneumoconiosis. *See* Pet'r's Br. at 22.

A miner who worked in coal mines for fifteen years or longer is entitled to a presumption that any "totally disabling respiratory or pulmonary impairment" that he has is pneumoconiosis. 30 U.S.C. § 921(c)(4). That presumption may be rebutted if the employer can "'rule-out' coal mine employment as a cause of the disability." *Big Branch*, 737 F.3d at 1071. But no one ever suggested that Marcum was entitled to that presumption. The ALJ repeatedly stressed that the presumption did *not* apply to Marcum's case and that the burden of proof rested with Marcum, JA at 258, 263, 278 (ALJ Op. at 6, 11, 26), and, in the section of the opinion that Island Creek finds problematic, the ALJ concluded that Marcum "failed to establish that he has pneumoconiosis based on the x-ray readings," *id.* at 279 (ALJ Op. at 27). Thus, rather than a vague attempt to import the "rule-out" standard, the ALJ's statement suggested only that, although there was conflicting x-ray evidence, that fact did not *preclude* a finding that Marcum had pneumoconiosis based on other evidence. This is an accurate statement of the law. *See* 20

7

C.F.R. § 718.202(b). Accordingly, the ALJ's "rule out" statement did not shift the burden of proof.[1]

## B.  The ALJ Appropriately Credited Doctors Forehand and Splan.

Island Creek's second argument is that the ALJ's decision to credit Drs. Forehand and Splan was not supported by substantial evidence. Island Creek correctly recites the background requirements that an ALJ "[w]eigh[] all of the relevant evidence together" to assess a claim, *Dixie Fuel Co. v. Dir., Office of Workers' Comp. Programs*, 700 F.3d 878, 881 (6th Cir. 2012) (internal quotation marks omitted), and "examine the reasoning employed" by a medical opinion as well as "any contrary test results or diagnoses," *Island Creek Coal Co. v. Compton*, 211 F.3d 203, 211 (4th Cir. 2000). But the ALJ properly discussed the qualifications and opinions of all four doctors, including the results of all testing they performed or relied on, reviewed their criticisms of each other's views, and then weighed everything together. *See* JA at 263–75, 279–83 (ALJ Op. at 11–23, 27–31). This was consistent with the ALJ's obligation to consider all relevant evidence.

---

[1]Island Creek suggests that the ALJ should have disregarded the inconclusive x-rays, weighed a single positive x-ray against three negative x-rays, and come to the "obvious" conclusion. *See* Pet'r's Br. at 21. It is not clear how this argument changes the analysis as the ALJ found that the x-ray evidence did not support Marcum. *See* JA at 279 (ALJ Op. at 27). Nor is it clear that Island Creek's "obvious" conclusion would necessarily be the right one. The ALJ was not required to rule mechanically for the side with more x-rays, *Wilt v. Wolverine Mining Co.*, 14 BLR 1-70, at *4 (Benefits Review Bd. 1990), and was permitted to focus on the more recent x-rays that were far more equivocal. *See Crace v. Kentland-Elkhorn Coal Corp.*, 109 F.3d 1163, 1167 (6th Cir. 1997).

The ALJ's specific determination that Dr. Forehand's opinion was "otherwise supported by the evidence available to him" was also supported by substantial evidence. *Id.* at 280 (ALJ Op. at 28). As the ALJ explained, Dr. Forehand's opinion was premised in large part on the fact that certain of Marcum's pulmonary-function tests were close to normal, while his blood-gas-exchange testing was not, which suggested that coal dust and not cigarette smoke was causing the blood-gas-exchange impairment. *See id.* at 264–65 (ALJ Op. at 12–13); *see also id.* at 54–59, 61–68 (First Forehand Dep. at 35:1–40:14, 42:16–46:21, 47:15–49:19). Indeed, Dr. Forehand testified that if Marcum "were highly susceptible to the effects of smoking, then given [his] smoking history," one would expect "to see a far worse" result on the forced expiratory volume test. *Id.* at 267 (ALJ Op. at 15); *see id.* at 70–71 (First Forehand Dep. at 51:7–52:6). This implied that pneumoconiosis caused "the pattern of impairment in the arterial blood gas study." *Id.* at 267 (ALJ Op. at 15). After his 2011 examination of Marcum, Dr. Forehand repeated similar conclusions. *See id.* at 268–69 (ALJ Op. at 16–17); *id.* at 112, 117–20 (Second Forehand Dep. at 9:14–21, 14:11–17:21). Ultimately, Dr. Forehand concluded that certain of Marcum's pulmonary-function tests—"the best way to measure the effect of cigarette smoking"—were close enough to normal that they implied that something else was causing the blood-gas-exchange impairment, and that "coal dust induced disease can cause interference with gas exchange without limiting air flow." *Id.* at 270 (ALJ Op. at 18); *see id.* at 127–28 (Second Forehand Dep. at 24:10–25:1). This consistent pattern of test results supported Dr. Forehand's

explanation why the impairment could not be explained by cigarette smoking and was instead related to coal dust.

The ALJ also properly credited Dr. Splan's view "that coal dust and cigarette smoking contributed to the Claimant's obstructive disease and pneumoconiosis," while Marcum's "history of pulmonary embolism contributed to his impairment, but to a lesser extent." *Id.* at 281 (ALJ Op. at 29). The ALJ found that this opinion was "otherwise supported by the evidence available to him." *Id.* This evidence included Dr. Splan's examination of Marcum, a "pulmonary function test [that] showed moderately severe obstructive disease with mild restriction," and an "arterial blood gas study [that] revealed moderately severe hypoxemia at rest." *Id.* at 271 (ALJ Op. at 19); *see also id.* at 100–01 (Splan Report at 2–3). Dr. Splan's view is also consistent with Dr. Forehand's findings, which provides further support for the ALJ's credibility determination.

Nor did the ALJ err in crediting Drs. Forehand and Splan despite their positive reading of x-rays that the ALJ found—based on her method of comparing the relative qualifications of those who reviewed the x-rays—to be negative or inconclusive. As the ALJ explained, the opinions of both doctors were undermined by this fact, but "the radiologist who found [the x-ray that Dr. Forehand interpreted] negative agreed that there were visible nodules, albeit from another cause (calcified granulomas)," and Dr. Splan's opinion was "otherwise supported by the evidence available to him." *Id.* at 280–81 (ALJ Op. at 28–29). Thus, the ALJ recognized the

potential credibility-undermining effect of the x-rays, and explained why each doctor's x-ray interpretation did not create a large credibility issue.[2]

Island Creek also critiques the ALJ for suggesting that Drs. Forehand and Splan gave opinions that were "consistent with the regulations." Pet'r's Br. at 26–28. The ALJ suggested that crediting Dr. Forehand was "consistent with the premise underlying the regulations that coal dust can cause damage to the lungs even absent a positive x-ray," JA at 280–81 (ALJ Op. at 28–29), and that Dr. Splan's "attribution of the Claimant's multiple diagnoses to a combination of factors is consistent with the regulations, and sufficient to meet the requirement that coal dust be a contributing cause to the Claimant's impairment to support a diagnosis of legal pneumoconiosis," *id.* at 281 (ALJ Op. at 29). Although Island Creek takes these as attempts to suggest "that a diagnosis of legal pneumoconiosis is preferred by the regulations," the ALJ was actually explaining that Dr. Forehand's diagnosis was acceptable in the absence of a positive x-ray, 20 C.F.R. § 718.202(b), and that Dr. Splan's diagnosis that multiple causes existed for Marcum's condition did not undermine his view that one of those causes was pneumoconiosis, 20 C.F.R. § 718.201(b).

---

[2]Island Creek cited two decisions of the Fourth Circuit to support the proposition that doctors whose x-ray readings are rejected should be disregarded, but neither case applies here. *Compton*, 211 F.3d at 211–12, addressed an ALJ's decision to credit an expert's diagnosis that was based *solely* on an x-ray when the ALJ had "determined that the x-ray evidence did not establish pneumoconiosis." *Toler v. Eastern Associated Coal Co.*, 43 F.3d 109, 115–16 (4th Cir. 1995), says nothing about the consideration of the opinion of an expert whose x-ray readings were rejected, and instead discusses instances in which pneumoconiosis had already been established and courts refused to consider medical opinions that contradicted that conclusion in evaluating arguments over whether the pneumoconiosis caused the claimant's total disability.

11

Finally, Island Creek suggests that the ALJ used "an incorrect definition of legal pneumoconiosis" in assessing Dr. Splan's opinion, making it erroneous to credit that opinion "as sufficient to establish the presence of legal pneumoconiosis." Pet'r's Br. at 28–30. Island Creek's concern is based on the ALJ's statement that Dr. Splan's diagnosis was "sufficient to meet the requirement that coal dust be a *contributing cause* to the Claimant's impairment." JA at 281 (ALJ Op. at 29) (emphasis added). Island Creek is correct that legal pneumoconiosis is defined to include "any chronic restrictive or obstructive pulmonary disease arising out of coal mine employment," 20 C.F.R. § 718.201(a)(2), and that a disease is found to arise out of coal-mining employment if it is "significantly related to, or substantially aggravated by, dust exposure in coal mine employment," 20 C.F.R. § 718.201(b). But we have held that this may be proven "by showing that [a miner's] disease was caused 'in part' by coal mine employment." *Arch on the Green, Inc. v. Groves*, 761 F.3d 594, 598–99 (6th Cir. 2014) (quoting *Eastover Mining*, 338 F.3d at 509). For example, evidence that a miner's pulmonary condition "was caused by both his smoking and his exposure to coal dust" was enough to show that the miner "suffered from legal pneumoconiosis"—even where a doctor testified "that smoking was the more important cause." *Id.* at 599.[3] Accordingly, the ALJ did not misapply the law.

---

[3]To be sure, Marcum needed to convince the ALJ that his pneumoconiosis "was 'a substantially contributing cause of'" his total disability. *Groves*, 761 F.3d at 599 (quoting 20 C.F.R. § 718.204(c)(1)). A finding that pneumoconiosis was a cause merely "in part" is insufficient for this disability-causation finding, *id.* at 599–601, but Island Creek has not challenged the disability-causation portion of the ALJ's decision. Its brief focuses on whether the ALJ appropriately found "the existence of pneumoconiosis." Pet'r's Br. at 2; *see also id.* at 25–31 (section regarding Drs. Forehand and Splan, which argues only that their opinions were

We therefore find that the ALJ applied the correct standards to assessing the credibility of Drs. Forehand and Splan, and that her determination that the doctors were credible was supported by substantial evidence.

## C. The ALJ Appropriately Declined to Credit Doctors Fino and Jarboe.

Island Creek's final argument is that the ALJ wrongly disbelieved Drs. Fino and Jarboe. Before assessing the many issues that Island Creek raises with specific credibility determinations, we address its argument that the ALJ shifted the burden of proof.

The ALJ discounted the opinions of Drs. Fino and Jarboe because neither doctor explained why coal dust was not a potential contributor to the disabling blood-gas impairment from which Marcum suffered and why the opacity that was visible on each x-ray was not caused by coal dust at least in part. JA at 281–82 (ALJ Op. at 29–30). To Island Creek, this is akin to a requirement that Island Creek prove that Marcum did not have pneumoconiosis. But the ALJ was not setting forth a requirement that Island Creek meet any burden of proof—that burden was met by Marcum's own experts. Instead, the ALJ was making a credibility finding about the two

---

improperly credited to establish that Marcum had pneumoconiosis). In any event, Island Creek forfeited any disability-causation argument by failing to raise it before the Benefits Review Board, which found that Island Creek's sole argument on the disability-causation issue "allege[d] no specific error in regard to the administrative law judge's consideration of the evidence." JA at 306 (Board Op. at 6 n.10). This led the Board to conclude that it could not review even a general argument regarding disability causation, as it "must limit its review to contentions of error that are specifically raised by the parties." *Id.* (citing 20 C.F.R. §§ 802.211, 802.301). Under similar circumstances, we have held that a party may "not obtain review of the ALJ's decision on any issue not properly raised before the [Board]." *Consol. Coal Co. v. McMahon*, 77 F.3d 898, 904 (6th Cir. 1996) (quoting *Hix v. Dir., Office of Workers' Comp. Programs*, 824 F.2d 526, 527 (6th Cir. 1987)).

doctors. Dr. Fino admitted that coal dust can cause disabling blood-gas impairments, *id.* at 184 (Fino Dep. at 21:16–19), and evidence suggested that opacities on an x-ray could be indicative of pneumoconiosis. Thus, in opining that pneumoconiosis is not present in a patient who had such impairments and x-rays, a doctor's failure to explain why a potential cause was not considered could be concerning.

### 1. Dr. Fino

The ALJ expressed three concerns with Dr. Fino's opinion, each of which were supported by substantial evidence:

*First*, the ALJ faulted Dr. Fino for failing to "offer any creditable reason for excluding coal dust as a contributing cause to [Marcum's] disabling impairment." *Id.* at 281 (ALJ Op. at 29). Dr. Fino admitted that coal dust could contribute to blood-gas-exchange impairments like those that Marcum has, *id.* at 184 (Fino Dep. at 21:16–19), but struggled during his deposition to explain with any certainty the cause of Marcum's impairment. Dr. Fino first explained, "I don't believe that simple pneumoconiosis is present, I don't believe that there is an explanation by the chest x-ray for this." *Id.* at 181 (Fino Dep. at 18:16–18). He then hypothesized that either granulomatous disease or cigarette smoking were partial causes, *id.* at 181 (Fino Dep. at 18:18–22), and testified that Marcum's blood clots could also be a cause, *id.* at 181–82 (Fino Dep. at 18:24–19:7). Dr. Fino's reasoning for excluding pneumoconiosis as a cause of the gas-exchange impairment appears to have been limited to his x-ray interpretation, even though a negative x-ray is not alone a reason for finding that a miner does not have legal pneumoconiosis. *See id.* at 181

(Fino Dep. at 18:16–18); 20 C.F.R. § 718.202(b). The ALJ therefore had a substantial basis for discrediting Dr. Fino's opinion on this ground.

*Second*, the ALJ found that Dr. Fino "did not explain why granulomatous disease must be considered the single cause of changes on the x-rays." *Id.* at 281 (ALJ Op. at 29). Dr. Fino had testified that he "did not think [Marcum's chest x-ray] was consistent with coal workers' pneumoconiosis" because "it had nodular lesions that were calcified, and I felt that this was due to old granulomatous disease, histoplasmosis, tuberculosis that he had contracted asymptomatically way in the past," adding that "[i]t's more likely that it's a fungal disease, but I did not believe that those changes were secondary to coal workers' pneumoconiosis." *Id.* at 177 (Fino Dep. at 14:3–11). Dr. Fino admitted that "everybody is seeing the small nodular lesions" and "noting that all or at least some of them are calcified," but that "there are differences in opinion as to whether they are related to coal mine dust or they are granulomata." *Id.* at 177 (Fino Dep. at 14:19–24). Dr. Fino never elaborated *why* the calcification that "everyone" saw pointed to granulomatous disease and not pneumoconiosis. In light of this lack of explanation, the ALJ had reason to question Dr. Fino's opinion.

*Third*, the ALJ criticized Dr. Fino for his overreliance on x-rays to exclude a diagnosis of legal pneumoconiosis, noting that Dr. Fino's "emphasis on the lack of fibrosis" in Marcum's lungs, was indicative of his overall focus on clinical pneumoconiosis. *See id* at 281–82 (ALJ Op. at 29–30). Island Creek argues that Dr. Fino used the x-rays to exclude *clinical* pneumoconiosis, and that Dr. Fino's exclusion of legal pneumoconiosis was based on other factors. The portions

of Dr. Fino's deposition on which Island Creek relies do suggest that Dr. Fino considered other sources, including his view that pulmonary-function tests showed minimal restriction, JA at 175–76 (Fino Dep. at 12:2–12, 13:10–19), and the aforementioned discussion of Marcum's blood-gas-exchange results, *id.* at 180–82 (Fino Dep. at 17:25–19:7). Nevertheless, there was reason to think that Dr. Fino relied on x-rays extensively. His opinion that Marcum's blood-gas-exchange impairment was not caused by coal dust appeared to be based exclusively on x-rays, *id.* at 181 (Fino Dep. at 18:16–18), and his explanation for the pulmonary-function results was tentative and unclear, *id.* at 175 (Fino Dep. at 12:2–12) (suggesting that the minimal pulmonary-restrictive finding was not "necessarily" due to fibrotic lungs). Accordingly, the ALJ was not wrong to note that Dr. Fino appeared to rely heavily on x-rays.

## 2. Dr. Jarboe

The ALJ expressed three concerns with Dr. Jarboe's testimony, two of which were supported by substantial evidence:

*First*, the ALJ found that Dr. Jarboe's "diagnosis of histoplasmosis is speculative, based on generalities." *Id.* at 282 (ALJ Op. at 30). Island Creek argues that this finding was not supported by substantial evidence because Dr. Jarboe based his opinion on the differences between x-rays of lungs with pneumoconiosis and those with histoplasmosis. But Dr. Jarboe's x-ray reading was that the visible nodules in Marcum's lungs were due to *granulomatous* disease, which he identified due to the "[d]iffuse calcified shadows in the lung." *Id.* at 210 (Jarboe Dep. at 19:19–20). Dr. Jarboe added that "[y]ou can get calcified coal workers' nodules, but . . . first

of all, that's very, very uncommon" and "[c]oal workers' pneumoconiosis tends to cause a clustering of nodules in the upper zones predominantly . . . and this distribution was more diffuse." *Id.* at 210–11 (Jarboe Dep. at 19:25–20:10). Dr. Jarboe then suggested that the granulomatous scarring was due to Marcum having previously had histoplasmosis, stating that, "in the state of Kentucky, almost always this is going to be caused by healed histoplasmosis." *Id.* at 210 (Jarboe Dep. at 19:22–24). Thus, although Dr. Jarboe explained why he read the x-ray to reflect granulomatous scarring, his underlying explanation that the scarring was caused by histoplasmosis is unexplained but for the brief and general statement that it is nearly always the cause of such scarring in Kentucky. The ALJ's decision to use this generality to discount Dr. Jarboe's credibility was supported by substantial evidence.

*Second*, the ALJ found that Dr. Jarboe "did not offer any adequate explanation why the Claimant's known exposure to coal mine dust for over 14 years was not at least a contributing factor to his disabling hypoxemia . . . ." *Id.* at 282 (ALJ Op. at 30). During his deposition, Dr. Jarboe suggested that Marcum's smoking and "granulomatous scarring" was causing the gas-exchange impairment. *See id.* at 220–21 (Jarboe Dep. at 29:14–30:13). This occurred, according to Dr. Jarboe, because both the smoking and the scarring caused inflammation that prevented inhaled air from getting into certain parts of the lungs, but blood was still pumped to those areas to be oxygenated; when no oxygen was present, the blood-gas-exchange condition arose. *See id.* at 221–23 (Jarboe Dep. at 30:16–32:10). Unlike Dr. Fino, then, Dr. Jarboe offered an explanation of the cause of Marcum's blood-gas-exchange condition that was more than

speculation. But given that coal dust can contribute to blood-gas-exchange impairments, and that legal pneumoconiosis is defined to include such impairments that are caused at least in part by coal dust exposure, the ALJ was not wrong to seize on Dr. Jarboe's failure to explain how he could be sure that smoking and granulomatous disease were the sole cause of this condition or how he could rule out the effect of coal dust on Marcum's blood-gas-exchange impairment.

*Third*, the ALJ found that Dr. Jarboe did not "offer any explanation why both granulomatous disease and pneumoconiosis could not be responsible for changes that all readers saw on the x-rays." *Id.* at 282 (ALJ Op. at 30). This finding is not reflective of Dr. Jarboe's testimony. Dr. Jarboe testified to his opinion regarding the different appearances of pneumoconiosis and granulomatous disease on x-rays, *see id.* at 210–11 (Jarboe Dep. at 19:15–20:12). This explanation suggests that pneumoconiosis was not responsible for the conditions that x-ray readers found because, according to Dr. Jarboe, those conditions were not consistent with the appearance of pneumoconiosis on an x-ray. We need not remand the case for further proceedings based on this error, however, because two of the three bases given by the ALJ for discounting Dr. Jarboe's opinion survive Island Creek's challenges, and one of them—the failure to "explain[] why over 13 years of coal dust exposure was not a factor in the Claimant's gas exchange abnormality"—was especially emphasized in the ALJ's Opinion. *See id.* at 282 (ALJ Op. at 30). We have previously held that "the accuracy" of one part of an ALJ's credibility assessment was "irrelevant" where other reasons given by an ALJ for discounting a doctor's opinion were unchallenged because "some discounting of [that doctor's] opinion was

18

appropriate," and we therefore refrained from "second-guess[ing] the ALJ's ultimate weighing of medical opinions." *Island Creek*, 737 F.3d at 1061. We similarly refrain from second-guessing the ALJ's weighing of the four medical opinions based only on this one point.

## III. CONCLUSION

For the foregoing reasons, we **DENY** the petition for review of the ALJ's award of black-lung benefits to Marcum.